853 A.2d 909

IN THE MATTER OF MILDRED KERI, A MENTALLY
INCOMPETENT PERSON.

Argued October 20, 2003—Decided August 5, 2004.

52

*Donald D. Vanarelli* argued the cause for appellant, Richard Keri (*Mr. Vanarelli,* attorney; *Mr. Vanarelli* and *Whitney W. Bremer,* on the brief).

*Linda S. Ershow–Levenberg* argued the cause for amicus curiae New Jersey Chapter of National Academy of Elder Law Attorneys (*Fink, Rosner, Ershow–Levenberg,* attorneys).

*Gwen E. Orlowski* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Mr. Miller* and *Ms. Orlowski* on the brief).

*Peggy Sheahan Knee* argued the cause for amicus curiae New Jersey State Bar Association (*Karol Corbin Walker,* President, attorney; *Ms. Sheahan Knee, Sharon A. Balsamo, Janet B. Lurie, Sharon Rivenson Mark* and *Shirley B. Whitenack* on the brief).

*Edward H. Tetelman,* Acting Public Guardian, argued the cause for amicus curiae Office of the Public Guardian for Elderly Adults (*Mr. Tetelman,* attorney; *Mr. Tetelman, Joseph A. Fontana* and *Helen Dodick,* on the briefs).

*Daniel J. Jurkovic* submitted a brief on behalf of amici curiae National Academy of Elder Law Attorneys and Guardianship Association of New Jersey, Inc. (*Mr. Jurkovic,* attorney; *Mr. Jurkovic, Sharon Rivenson Mark* and *Mary E. WanderPolo,* on the brief).

Chief Justice PORITZ delivered the opinion of the Court.

This case presents the question whether self-sufficient adult children who serve as their incompetent parents' legal guardians may transfer to themselves all or part of their parents' assets in order to hasten their parents' eligibility for Medicaid benefits. We hold that when certain criteria are satisfied, they may, in order to effectuate a decision their parents would have made if competent.

## I.

When this litigation commenced two years ago, Mildred Keri (Keri), now ninety years old, lived alone in her New Brunswick home. Since 1995, she had been dependent exclusively on the care of her two sons, Richard Keri (Richard or petitioner) and

Charles Keri (Charles). To forestall placing her in a nursing home, both men visited her regularly on alternating days and made numerous arrangements for their mother's care in their absence. Among other things, they arranged for Keri's lunch to be delivered daily at noon by Meals on Wheels, and provided her evening meal themselves when they visited with her.

In the months preceding this litigation, Keri became increasingly difficult to care for, refusing her sons' requests for her to live with them and neglecting to maintain her personal hygiene. After finding her house filled with smoke one day, her sons had the stove disconnected and capped to prevent future harm to their mother. Her condition deteriorated to the point where Richard and Charles finally determined that they could no longer avoid placing her in a nursing home. Keri's treating physicians certified she suffered from an irreversible dementia that had so impaired her cognitive abilities that she could no longer care for herself. They concluded Keri would not experience any significant improvement in the future even with treatment. In their view, her condition would render her vulnerable to abuse, exploitation, and neglect.

Financially, Keri's unencumbered residence was found to constitute the bulk of her net worth (at approximately $170,000 according to appraisals requested by the petitioner),[1] whereas her pension benefits and Social Security provided a monthly income of $1,575.45. Although Keri's will divides her estate equally between her two sons, petitioner is her agent by a general power of attorney executed on November 11, 1996. That instrument al-

---

[1] There is some discrepancy in the record as to the value of Keri's assets. The trial court stated that she had about $40,000 in liquid assets in addition to her home, and Richard, in his testimony, affirmed the judge's estimate. According to Richard's certification, however, his mother only had about $17,000 in other assets—$500 in jewelry, and the remainder in a checking account. Estimates of the home's value also differed. The average value given by two real estate brokers, whose certifications were attached to the complaint, was $161,250.00; the average value given by two appraisers, whose reports were attached to a later certification submitted by petitioner, was $183,500.00.

lowed petitioner to apply for Medicaid benefits for his mother, but did not authorize him to make gifts on her behalf for any reason.

On May 10, 2002, pursuant to *N.J.S.A.* 3B:12–25, petitioner sought guardianship of his mother and her estate. He also submitted for court approval his proposed Medicaid "spend-down plan." He sought authority to sell his mother's house and transfer a significant portion of the proceeds to himself and his brother in equal shares as a means of "spending down" her assets to acceler- ate her Medicaid eligibility.[2] Assuming that his mother's monthly nursing home expenses would be $6,500 and that the sale of her house would net $170,000, Richard determined that, after subtract- ing her monthly income of $1,575.45, Keri would need $4,924.55 per month from her savings to cover her stay. Based on those figures, petitioner sought permission to transfer $92,000 of the proceeds to himself and his brother in equal shares. According to his calculations, the remaining $78,000 would be sufficient to pay his mother's nursing home bills during the sixteen-month period of Medicaid ineligibility triggered by the transfer.[3] In other words, seventeen months after the proposed transfer, Keri would have "spent down" enough of her assets to qualify for Medicaid.

Throughout the trial below, petitioner maintained that, if not so ill, his mother would have approved of and undertaken such an

[2] To qualify for Medicaid in New Jersey based on age, a state resident must not have available resources exceeding $2,000. *N.J.A.C.* 10:71–3.1, –3.4, –3.9(a)1, and –4.5(b). Keri's house would not be considered an asset for Medicaid-eligibility purposes if it remained her principal residence. *N.J.A.C.* 10:71–4.4(b)1. However, petitioner seeks to sell his mother's residence and transfer monies to himself and his brother because, under federal law, the state is authorized to impose a lien on Keri's house for reimbursement of Medicaid costs as she is unlikely to return to it. 42 *U.S.C.A.* § 1396p(a)(1)(B).

[3] Congress imposes periods of Medicaid ineligibility for applicants who give away their assets for less than fair market value within thirty-six months of their applications. 42 *U.S.C.A.* § 1396p(c); *see N.J.A.C.* 10:71–4.10(a) (complying with federal Medicaid requirement by imposing period of ineligibility). The period of ineligibility, in months, is determined by dividing the amount divested for less than fair market value by the average monthly cost of nursing home care in New Jersey. *N.J.A.C.* 10:71–4.10(m)1.

estate planning strategy to preserve a significant portion of her assets for her two sons. His brother, Charles, did not object to the proposal. As required, Keri's court-appointed counsel prepared a Report of a Court Appointed Attorney recommending that the court approve petitioner's estate plan, although he did not offer any evidence or cross-examine Richard.

On June 26, 2002, the trial court granted petitioner's guardianship application and ordered the sale of Keri's residence and her placement in a nursing home. The trial court denied petitioner authority to execute the Medicaid spend-down plan, however, refusing to approve strategies designed to "[pauperize] human beings and citizens in the United States solely to make them [wards] of the taxpayers."

The Appellate Division affirmed in part, reversed in part, and remanded for further proceedings. *In re Keri*, 356 *N.J.Super.* 170, 172, 811 *A.*2d 942 (2002). Because the panel would not presume that a competent and reasonable adult would engage in spend-down Medicaid planning, it held that courts should employ a purely subjective standard "to protect the incompetent's right to self-determination." *Id.* at 179, 811 *A.*2d 942. Under that standard, approval of a spend-down plan proposed by an incompetent's self-sufficient adult children should occur only when the incompetent person has indicated that preference before losing competency. *Ibid.* Keri had never expressed a preference, and therefore the Appellate Division found that the trial court properly rejected petitioner's proposal. Further, out of concern for Keri's wishes and best interests, the Appellate Division reversed and remanded the matter for reconsideration whether petitioner should be permitted to sell his mother's house and place her in a nursing facility, and directed the trial court to seek intervention of the Public Guardian on Keri's behalf pursuant to *N.J.S.A.* 52:27G–25h. *Id.* at 180, 811 *A.*2d 942.

We granted Richard's petition for certification, *In re Keri*, 175 *N.J.* 549, 816 *A.*2d 1050 (2003), and, also, the participation of *amici*, Office of the Public Guardian for Elderly Adults, New

Jersey State Bar Association, Legal Services of New Jersey, New Jersey Chapter of the National Academy of Elder Law Attorneys, and the National Academy of Elder Law Attorneys and Guardianship Association of New Jersey. We now reverse.

## II.

### A.

*N.J.S.A.* 3B:12–49 states, in pertinent part:

The court has, for the benefit of the ward, his dependents and members of his household, all the powers over his estate and affairs which he could exercise, if present and not under a disability, except the power to make a will, and may confer those powers upon a guardian of his estate. These powers include, but are not limited to power to convey or release the ward's present and contingent and expectant interests in real and personal property, . . . and to renounce any interest by testate or intestate succession or by inter vivos transfer.

Those powers are integral to a statutory scheme in which courts and guardians are authorized to manage the estates of minors and incompetent persons. *N.J.S.A.* 3B:12–36 to –64. Under that scheme courts may

exercise, or direct the exercise of, or release the powers of appointment of which the ward is donee, . . . renounce interests, . . . make gifts in trust or otherwise, or . . . change beneficiaries under insurance and annuity policies, only if satisfied, after notice and hearing, that it is in the best interests of the ward.

[*N.J.S.A.* 3B:12–50.]

Additionally,

[i]f the estate is ample to provide for the purposes implicit in the distributions authorized by [the statute], a guardian for the estate of a mental incompetent may apply to the court for authority to make gifts to charity and other objects as the ward might have been expected to make.

[*N.J.S.A.* 3B:12–58.]

In short, when managing the estates of incompetent persons, including the exercise of the power to make gifts, our courts must find that the proposed action is in "the best interests of the ward," *N.J.S.A.* 3B:12–50, and that any gifts proposed are such "as the ward might have been expected to make," *N.J.S.A.* 3B:12–58. Together, those statutory provisions incorporate and reconcile the best interests standard with the common law equita-

ble doctrine of substituted judgment. Only when the estate contains the resources necessary for the benefit of the ward (best interests), may the guardian make gifts "in the same manner as the incompetent would if able to function at full capacity" (substituted judgment). *In re Labis,* 314 *N.J.Super.* 140, 146, 714 *A.*2d 335 (App.Div.1998).

### B.

The concepts found in the statutes governing the powers of courts and guardians have long been a part of our law. Prior to the enactment of *N.J.S.A.* 3B:12–36 to –64, our courts relied on the doctrine of *parens patriae* to "intervene in the management and administration of an incompetent's estate in a given case for the benefit of the incompetent or of his estate." *In re Trott,* 118 *N.J.Super.* 436, 440, 288 *A.*2d 303 (Ch.Div.1972). In *Trott,* the court permitted a guardian to transfer $100,000 and make yearly gifts of the ward's estate to her four living descendents as a means of reducing the ward's estate tax burden. *Id.* at 438–39, 444, 288 *A.*2d 303. The court endorsed the principle that

> in the management of the estate of [an] incompetent, "the guardian should be authorized to act as a reasonable and prudent [person] would act [in the management of his own estate] under the same circumstances, unless there is evidence of any settled intention of the incompetent, formed while sane, to the contrary."
> [*Id.* at 441, 288 *A.*2d 303 (third alteration in original) (quoting *In re Guardianship of Christiansen,* 248 *Cal.App.*2d 398, 56 *Cal.Rptr.* 505, 521 (1967)).]

In accepting that thesis, the court relied on the approach of the Supreme Judicial Court of Massachusetts in *Strange v. Powers,* wherein that court stated:

> We agree with the modern trend of cases both in England and in the United States. There is no reason why an individual, simply because he happens to be a ward, should be deprived of the privilege of making an intelligent commonsense decision in the area of estate planning, and in that way forced into favoring the taxing authorities over the best interests of his estate.
> [358 *Mass.* 126, 260 *N.E.*2d 704, 709 (1970).]

To answer in a specific case the question whether the guardian should be permitted "to make the gifts proposed," *Trott, supra,* requires the guardian to establish five criteria:

(1) the mental and physical condition of the incompetent are such that the possibility of her restoration to competency is virtually nonexistent; (2) the assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in the light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs in the style and comfort in which she now is (and since the onset of her incompetency has been) maintained, giving due consideration to all normal contingencies; (3) the donees constitute the natural objects of the bounty of the incompetent by any standard . . .; (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes.

[118 *N.J.Super.* at 442–43, 288 *A.*2d 303.]

*See also Christiansen, supra,* 56 *Cal.Rptr.* at 523–25 (establishing factors substantially similar to those of *Trott* ). After finding that the proposed financial plan met those criteria, the *Trott* court authorized the guardian to execute the plan. 118 *N.J.Super.* at 444, 288 *A.*2d 303.

The *Trott* criteria, which we now adopt, have been applied by our courts in exercising their statutory authority to determine whether estate-planning proposals offered by guardians are in the wards' best interests and give effect to the wards' wishes had they been able to express them. *See Labis, supra,* 314 *N.J.Super.* at 147, 714 *A.*2d 335 (observing that relevant provisions of Title 3B "incorporated the concepts of *Trott* "); *see also In re Conroy,* 98 *N.J.* 321, 360, 486 *A.*2d 1209 (1985) ("[T]he goal of decision-making for incompetent patients should be to determine and effectuate, insofar as possible, the decision that the patient would have made if competent."). In effect, *Trott* provides a framework consisting of a set of objective tests (criteria (1), (3) and (4)) for the application of substituted judgment, taking into account the ward's best interests (criterion (2)). Criterion (5), however, introduces a subjective test with a high evidentiary burden to rebut substituted judgment: that "there is no substantial evidence" the ward, "if competent," would not approve a Medicaid spend-down plan.

Thus, in *Labis, supra,* a case that in many respects resembles the case at bar, the Appellate Division reversed an order of the trial court preventing petitioner (who was her husband's court-

appointed guardian) from carrying out an interspousal transfer of the marital residence as a Medicaid estate planning measure. 314 *N.J.Super.* at 142, 714 *A.*2d 335. Applying the *Trott* factors, the appellate court allowed the transfer to proceed because the ward's wife and two adult children were the natural objects of his bounty, the transfer would neither interrupt nor detract from the quality or duration of his medical care, and he was expected never to regain competency. *Id.* at 147–48, 714 *A.*2d 335.

Significantly, the panel dismissed as "erroneous [the] view that the proposed interspousal transfer was contrary to public policy." *Id.* at 144, 714 *A.*2d 335. The trial court had reasoned that an injustice would arise from the transfer in that the wife, if she predeceased her husband, could then bequeath the marital home to their adult children " 'free of the claims of the public.' " *Ibid.* The Appellate Division acknowledged the likelihood of that result, but concluded the court below had "failed to consider that the interspousal transfer would benefit [the ward] in carrying forth his probable actions if he were competent to address the situation," and that federal Medicaid legislation had established eligibility rules related to such transfers. *Ibid.* Because the ward had prepared a will leaving his assets to the petitioner, the court believed it "[safe to] assume that if . . . competent he would take any lawful and reasonable action to minimize obligations to the State . . . in order to secure the maximum amount available to support his wife . . . and benefit his children." *Id.* at 148, 714 *A.*2d 335. Pursuant to *N.J.S.A.* 3B:12–49 and 3B:12–50, as informed by the *Trott* criteria, the Appellate Division approved the guardian's request. *Ibid.*

In *Cohen, supra,* similar reasoning led the Appellate Division to reject a settlement proposed by beneficiaries under the will of an incompetent testator and by her guardian, and approved by the chancery court in the face of contentions that the parties had never reached agreement. 335 *N.J.Super.* at 15–16, 760 *A.*2d 1128. The product of a complicated series of interfamilial wranglings, the approved settlement provided for the "division [of the

incompetent's estate] . . . into equal family shares and the immediate gifting of large portions of the estate to the beneficiaries under [a prior] trust agreement" executed by the incompetent when she was of sound mind. *Id.* at 25, 760 *A.*2d 1128. The settlement both revoked that prior trust, a beneficiary of which was one of the incompetent's two adult sons, and authorized a distribution to that son's second wife, who had been excluded from the ward's initial testamentary plan. *Id.* at 31, 760 *A.*2d 1128.

The Appellate Division found that the settlement agreement failed to satisfy three of the *Trott* criteria (as had the *Labis* court, *Cohen* turned to *Trott* for guidance in the exercise of its power under Title 3B). *Id.* at 29, 760 *A.*2d 1128. Specifically, the court determined that Title 3B permits "sweeping changes to an incompetent's testamentary plan" only when the donees are natural objects of the incompetent's bounty, the transfer benefits the ward, his family, or his estate, and there is an absence of substantial evidence indicating contrary intent. *Id.* at 32, 760 *A.*2d 1128. In *Cohen,* when she was well, the incompetent had "prepared a detailed testamentary plan . . . [that] was deliberate[ly] and carefully crafted" to prevent her son's second wife from sharing in her estate even though that result meant higher death and transfer taxes. *Id.* at 30, 760 *A.*2d 1128. By providing, among other things, a "benefit for [the son's second wife]," the settlement agreement "alter[ed] the substance of the will and authorize[d] a large distribution to someone who [was] not an object of [the ward's] bounty as expressed in her will." *Id.* at 32, 760 *A.*2d 1128. The agreement failed the *Trott* criteria because substantial evidence demonstrated that it was "contrary to [the ward's] clear testamentary intent." *Id.* at 33, 760 *A.*2d 1128.

### C.

The New Jersey cases we have reviewed support the petitioner's claim that when a Medicaid spend-down plan does not interrupt or diminish a ward's care, involves transfers to the natural objects of a ward's bounty, and does not contravene an expressed

prior intent or interest, the plan, *a fortiori*, provides for the best interests of the ward and satisfies the law's goal to effectuate decisions an incompetent would make if he or she were able to act. That approach accords with decisions of the New York courts addressing the same issues.

> Under *N.Y. Mental Hyg. Law* § 81.21(a) (McKinney 1996), a court may authorize the guardian to exercise those powers necessary and sufficient ... to transfer a part of the incapacitated person's assets to or for the benefit of another person on the ground that the incapacitated person would have made the transfer if he or she had the capacity to act.

Those powers include the power to make gifts of all or part of the ward's estate. *Id.* § 81.21(a)(1). Also, the statute enumerates factors that our sister state's courts must consider in determining whether to approve a guardian's application to transfer a ward's assets. Those factors, which the New York courts have construed as "g[iving] ... recognition to the common-law doctrine of 'substituted judgment[,]' " *In re John XX*, 226 *A.D.*2d 79, 652 *N.Y.S.*2d 329, 332 (1996), *appeal denied*, 89 *N.Y.*2d 814, 659 *N.Y.S.*2d 854, 681 *N.E.*2d 1301 (1997), closely follow the *Trott* court's formulation.[4] *See also In re Shah*, 257 *A.D.*2d 275, 694 *N.Y.S.*2d 82, 87 (1999) ("The relief granted pursuant to Mental Hygiene Law article 81 is designed to permit an incapacitated person to do, by way of a surrogate, those essential things such a person could do but for his or her incapacity."), *aff'd*, 95 *N.Y.*2d 148, 711 *N.Y.S.*2d 824, 733 *N.E.*2d 1093 (2000).

When legal guardians have satisfied the statutory requirements, New York permits them to engage in Medicaid planning even when the guardians themselves may be the recipients of transfers from the wards' assets. *In re Shah*, 95 *N.Y.*2d 148, 711

---

[4] Other state courts also have employed the substituted judgment approach in guardianship cases. *See, e.g., Christiansen, supra*, 56 *Cal.Rptr.* at 522–23 (holding that guardian may transfer ward's property for tax purposes if ward, as "reasonably prudent" person, would have, absent evidence of contrary intent); *Rainey v. Guardianship of Mackey*, 773 *So.*2d 118, 122 (Fla.Dist.Ct.App.2000) (stating court should use substituted judgment standard to assess Medicaid spend-down proposal).

*N.Y.S.*2d 824, 733 *N.E.*2d 1093, 1098–99 (2000); *John XX, supra,* 652 *N.Y.S.*2d at 332; *In re DaRonco,* 167 *Misc.*2d 140, 638 *N.Y.S.*2d 275, 278 (Sup.Ct.1995); *In re Daniels,* 162 *Misc.*2d 840, 618 *N.Y.S.*2d 499, 502–504 (Sup.Ct.1994). Indeed, New York has established a presumption in favor of approving Medicaid spend-down proposals on the ground that a reasonable and competent person " 'would prefer that the costs of his care be paid by the State, as opposed to his family.' " *Shah, supra,* 711 *N.Y.S.*2d 824, 733 *N.E.*2d at 1099 (quoting *Shah, supra,* 694 *N.Y.S.*2d at 87); *see also Daniels, supra,* 618 *N.Y.S.*2d at 504 (noting that a "competent, reasonable individual . . . would prefer that his property pass to his child rather than serve as a source of payment for Medicaid and nursing home care bills").

We agree with the New York courts. We find, further, that the *Trott* criteria impliedly establish a presumption in favor of spend-down proposals by recognizing the benefit to the ward's estate of increasing the amounts available to beneficiaries by reducing payments to the government out of the estate. *Trott, supra,* 118 *N.J.Super.* at 443, 288 *A.*2d 303. Also significant, *Trott* requires "substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed." *Id.* at 443–44, 288 *A.*2d 303; *see also John XX, supra,* 652 *N.Y.S.*2d at 331 (presumption can be overcome with clear and convincing evidence under *N.Y. Mental Hyg. Law* § 81.21(e)(3) that incompetent individual "manifested . . . intention inconsistent with the proposed transfer"). Thus, under *Trott,* which we have adopted today, the presumption can be overcome only with "substantial evidence," a high threshold that is consonant with the approach in New York.

### III.

In this case, we find that petitioner's proposed Medicaid spend-down plan meets the *Trott* criteria and should be approved. It is undisputed that the first criterion of *Trott* is satisfied because Keri suffers from irreversible dementia. "[H]er restoration to

competency is virtually nonexistent." *Trott, supra,* 118 *N.J.Super.* at 442–43, 288 *A.2d* 303. Richard's spend-down plan is designed to provide adequate funding for his mother's nursing home care during the triggered period of Medicaid ineligibility and therefore meets the second criterion of *Trott.* The testimony indicates that Keri needs care twenty-four hours a day and that Richard was concerned about locating an appropriate facility for her. The trial court found that placement in a nursing home was necessary. Because both state and federal law prevent a Medicaid approved facility from transferring a patient based on a change in pay status, we should not anticipate that when Medicaid assumes Keri's financial obligations, the quality of her care will suffer. 42 *U.S.C.A.* § 1396r(c)(4)(A); 42 *C.F.R.* § 483.12(c)(1); *N.J.S.A.* 26:2H–12.8j, –12.8p.

Further, New Jersey statutes do not distinguish nursing homes that participate in Medicaid or Medicare from those that do not. *N.J.S.A.* 30:13–5. Regardless of the source of her payment, in a nursing home Keri will

> [h]ave the right to a safe and decent living environment and considerate and respectful care that recognizes [her] dignity and individuality ..., including the right to expect and receive appropriate assessment, management and treatment of pain as an integral component of [her] care consistent with sound nursing and medical practices.
>
> [*N.J.S.A.* 30:13–5j.]

Federal law is no less demanding; Medicaid funding is conditioned on nursing home compliance with federal standards for dignified care. 42 *U.S.C.A.* § 1395i–3; 42 *U.S.C.A.* 1396r; *see also* 42 *C.F.R.* §§ 483.1 to 483.100 (specifying requirements for states and long-term care facilities).[5]

The third criterion of *Trott, supra,* that the donees of petitioner's spend-down plan "constitute the natural objects of the bounty of the incompetent," unquestionably is met. 118 *N.J.Super.* at

---

[5] We are informed by *amicus curiae,* New Jersey Chapter of National Academy of Elder Law Attorneys, that New Jersey has 358 nursing homes, 320 of which participate in the Medicaid Program.

443, 288 *A.*2d 303.  Richard and Charles are Keri's sons, and her will leaves her estate in equal parts to them.  *See also N.J.S.A.* 3B:12–62 (in exercising powers over ward's estate, court or guardian must "take into account any known estate plan of the ward, including his [or her] will").  And, the proposed transfer of assets "will benefit and advantage the estate of the incompetent," as required by the fourth *Trott* criterion.  *Trott, supra,* 118 *N.J.Super.* at 443, 288 *A.*2d 303; *see also N.J.S.A.* 3B:12–49 (granting powers over ward's estate "for the benefit of the ward, his dependents and members of his household").  Assuming Keri nets $170,000 from the sale of her house, the plan proposes to preserve $92,000 of those proceeds for her sons to share.  If Keri spends the remainder of her life in a nursing home without selling her house, the state would be authorized to impose a lien for Medicaid cost reimbursement and Richard and Charles likely would get nothing.  42 *U.S.C.A.* § 1396p(a)(1)(B).  If Keri sold the house without transferring her assets, then her entire financial investment would be paid out in less than three years for nursing home costs, and, again, Richard and Charles likely would get nothing.  Under petitioner's plan, Keri could preserve approximately $46,000 from the proceeds of the sale of her home for each of her sons, the beneficiaries of her will.

Finally, the fifth *Trott* criterion is satisfied because there is no evidence in the record indicating that Keri would have disapproved petitioner's proposed spend-down plan.  The Appellate Division focused on Keri's preference to stay in her house, a preference that conflicted with petitioner's proposed plan.  But, if Keri could not live in her house without twenty-four hour care, as the trial court found, then she would have to pay for around-the-clock nursing.  The result is a veritable "Catch–22"—without selling her house, Keri does not have the funds to maintain in-home care for more than a short period.[6]  Moreover, because of

---

[6] As noted earlier, *supra* at 54 n. 1, 853 *A.*2d at 911 n. 1, the record is unclear whether Keri has more than $16,000 in other assets.  In any event, those other assets are limited and would not cover in-home care for very long.

her dementia Keri had become difficult at best, suggesting that in-home care would not be feasible. The question, then, is whether substantial evidence indicates that Keri would have disapproved petitioner's Medicaid planning proposal in those unfortunate circumstances. There simply is nothing in the record to suggest that disapproval.

We therefore find that petitioner's spend-down plan represents a decision that his mother "might have been expected to make," *N.J.S.A.* 3B:12–58, and satisfies both the applicable statutes and the *Trott* criteria.

## IV.

The Public Guardian for the Elderly takes the position that a child-beneficiary who serves as a guardian should not be permitted to propose a Medicaid spend-down plan for his or her ward because to do so would be a clear conflict of interest. He claims that here petitioner "is violating his fiduciary duty to his mother by self-dealing through medicaid planning." The Appellate Division accepted that position, stating:

> Unlike the situation involving spouses, there is a greater likelihood of conflict of interest when the gift-beneficiaries are children. As [a] Florida court observed ...: "Courts must make room for the possibility that some children may try to pressure vulnerable parents into divesting themselves of assets so that the estate is not depleted by the costs of nursing home care."
>
> [*Keri, supra,* 356 *N.J.Super.* at 179, 811 *A.*2d 942 (quoting *Rainey v. Guardianship of Mackey,* 773 *So.*2d 118, 122 (Fla.Dist.Ct.App.2000)).]

There is a fundamental problem with the approach taken by the Public Guardian and the court below. As in this case, the natural objects of a ward's bounty often are the same persons likely to be chosen by the courts as guardians, *i.e.*, children, spouses, close friends or relatives. *N.J.S.A.* 3B:12–25 directs the Superior Court to appoint "the spouse, if the spouse is living with the incompetent as man and wife at the time the incompetency arose, or ... his heirs." The very statute establishing the Office of the Public Guardian for Elderly Adults declares that the Public Guardian's services may be needed "where there are no willing and responsi-

ble family members or friends to serve as guardian." *N.J.S.A.* 52:27G–21; *see also N.J.S.A.* 52:27G–26 (using similar language). Disqualifying those individuals from receipt of asset transfers on conflict of interest grounds prevents the use of substituted judgment in the majority of cases because, if not disabled, incompetent persons most likely would transfer their assets to their guardians. In the circumstances presented, we find that adherence to the requirements of *N.J.S.A.* 3B:12–36 to –64, informed by the *Trott* criteria, should provide adequate protection against self-dealing by a beneficiary/guardian.

Out of an abundance of caution, the Appellate Division also held that "[a]bsent extraordinary circumstances, a court faced with an application of this nature should appoint the Public Guardian to represent the incompetent" pursuant to the Public Guardian For Elderly Adults Act (the Act), *N.J.S.A.* 52:27G–20 to –31. *Keri, supra,* 356 *N.J.Super.* at 180, 811 *A.*2d 942. In ordering a remand, the panel directed the trial court to seek intervention by the Public Guardian on Keri's behalf, primarily out of a "concern[ ] about whether [her] interests [were] being protected." *Ibid.* (internal citations omitted).

First, we take note of the Public Guardian's opposition to mandatory participation by his office in these matters. He points out that the primary purpose of the Act is to provide guardianship for incompetent elderly adults who do not have private persons willing to serve in that capacity. *N.J.S.A.* 52:27G–21. Although the Act arguably leaves open participation by the Public Guardian in a non-guardian role,[7] he argues that the courts must not impose

---

[7] The Public Guardian

[m]ay intervene in any guardianship or conservatorship proceeding involving a ward, by appropriate motion by the court, if the public guardian or the court deems the intervention to be justified because an appointed guardian or conservator is not fulfilling his duties, the estate is subject to disproportionate waste because of the costs of the guardianship or conservatorship, or the best interests of the ward require intervention.

[*N.J.S.A.* 52:27G–25h.]

a burden on his office that would take significant resources away from its important primary function as specified by the Legislature.

We observe in respect of this issue that safeguards already exist, apart from the constraints of law, for dealing with possible conflicts of interest in such cases. When a court orders a hearing on an application for guardianship, *Rule* 4:86–4(b) requires the appointment of counsel for the alleged incompetent. Appointed counsel must

> 1) personally interview the alleged incompetent; 2) make inquiry of persons having knowledge of the alleged incompetent's circumstances, his or her physical and mental state and his or her property; [and] 3) make reasonable inquiry to locate any will, powers of attorney, or health care directives previously executed by the alleged incompetent or to discover any interests the alleged incompetent may have as beneficiary of a will or trust.
>
> [*R.* 4:86–4(b).]

Counsel also must file a report with the court, "making recommendations concerning the ... issue of incompetency," and "stat[ing] whether the alleged incompetent has expressed dispositional preferences." *Ibid.* Moreover, our court rules provide that "where special circumstances come to the attention of the court by formal motion or otherwise, a guardian *ad litem* may, *in addition to counsel,* be appointed to evaluate the best interests of the alleged incompetent and to present that evaluation to the court." *R.* 4:86–4(d) (emphasis added). In light of those safeguards, we do not find it necessary for the Public Guardian to be involved in this [8] or any other like matter. We nonetheless accept the Public Guardian's offer to intervene when extraordinary circumstances exist and the expertise of that office would be helpful. In such cases,

---

This provision does not limit expressly the powers and responsibilities of the Public Guardian to guardianship services.

[8] Counsel appointed by the trial court in this case interviewed Keri and complied with the other requirements of *Rule* 4:86–4(b), although he did not offer evidence and declined to cross-examine petitioner. As the Appellate Division acknowledged, he "supported [petitioner's] application in all respects." *Keri, supra,* 356 *N.J.Super.* at 172, 811 *A.2d* 942.

the trial courts may wish to call on the Public Guardian to participate as needed.

Finally, the Appellate Division's characterization of Medicaid spend-down plans requires a response from this Court. The panel described such plans as follows:

> Putting euphemisms to one side, the plan, if followed by a competent person, is nothing other than self-imposed impoverishment to obtain, at taxpayers' expense, benefits intended for the truly needy.

[*Keri, supra,* 356 *N.J.Super.* at 174, 811 *A.*2d 942.]

Yet, the panel also acknowledged:

> Nonetheless, a competent individual may engage in such planning.... The question for us to resolve is whether it should be permitted by a guardian for the benefit of an incompetent's self-sufficient, adult children.

[*Id.* at 175, 811 *A.*2d 942.]

As *amicus curiae* Legal Services and the New Jersey State Bar Association point out, Medicaid planning is legally permissible under federal and state Medicaid law. Notwithstanding the Appellate Division's laudable purpose to preserve public monies for those who are in need, Congress has carefully defined and circumscribed Medicaid planning, as has the State of New Jersey. By its actions, Congress has set the public policy for this program and although some might choose a different course, the law has not. Few would suggest that it is improper for taxpayers to maximize their deductions under our tax laws to preserve income for themselves and their families—even though they are, by their actions, reducing the amount of money available to government for its public purposes. So long as the law allows competent persons to engage in Medicaid planning, incompetent persons, through their guardians, should have the same right, subject to the legal constraints laid out herein.

## V.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for the entry of an order consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.