937 A.2d 980 (2007)
397 N.J. Super. 384
B.D., Petitioner-Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES and Hudson County Board of Social Services, Respondents-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 2007.
Decided December 10, 2007.
Mary E. WanderPolo argued the cause for appellant (Ms. WanderPolo and Nicholas F. Lewis, of counsel and on the brief).
Julie Hubbs, Deputy Attorney General, argued the cause for respondent Division *981 of Medical Assistance and Health Services (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Hubbs, on the brief).
Respondent Hudson County Board of Social Services did not file a brief.
Before Judges STERN, C.S. FISHER and C.L. MINIMAN.[1]
The opinion of the court was delivered by
FISHER, J.A.D.
This appeal requires our examination of a type of Medicaid planning unlike those previously encountered. See, e.g., H.K. v. Dep't of Human Servs., 184 N.J. 367, 877 A.2d 1218 (2005); In re Keri, 181 N.J. 50, 853 A.2d 909 (2004); J.P. v. Div. of Med. Assistance & Health Servs., 392 N.J.Super. 295, 920 A.2d 707 (App.Div. 2007); W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J.Super. 25, 916 A.2d 1066 (App.Div.2007); In re Labis, 314 N.J.Super. 140, 714 A.2d 335 (App.Div. 1998). Here, B.D., a seventy-seven-year-old woman, conveyed her $259,917 home to her grandson for $10,191.70 in cash, the discharge of a $67,374.89 mortgage, and a lease of part of the home "for life." In focusing on the lease, the Director of the Division of Medical Assistance and Health Services concluded that B.D. did not receive fair market value and, therefore, imposed a Medicaid eligibility penalty period. Because the otherwise unambiguous phrase "for life," which significantly bears on the lease's value, is clouded by its context, and because the lease's true scope cannot be wrung solely from the lease itself, we remand for an evidentiary hearing.
The record reveals that B.D. was deemed eligible to participate in the Caregiver Assistance/NJEASE Homecare Program. This program was designed to provide services for individuals, who are at risk of nursing home placement, with the opportunity to remain in their homes. Upon learning that B.D. had transferred her home to M.D., her grandson, the Hudson County Board of Social Services reviewed her eligibility to remain in the program and later concluded, because B.D. had "received $10,191.70 for property worth $238,191.70 in net value," that the transfer of her home required the imposition of a thirty-seven-month penalty period.
A hearing was requested and the matter forwarded to the Office of Administrative Law for the development of a record. The parties stipulated to the facts they deemed relevant, provided the administrative law judge (ALJ) with exhibits, and filed briefs. No evidentiary hearing was conducted.
The parties stipulated that, on January 22, 2004, B.D. was a seventy-seven-year-old woman, who owned and had lived in a two-family house in Kearny for many years. The home had been appraised in October 2003 as having a value of $259,917. At that time, $67,374.98 was due on a mortgage encumbering the property. B.D. was also then receiving $1,180 per month in rent for the first floor apartment and $200 per month for rent on part of the second floor from J.D., her granddaughter.
On January 22, 2004, B.D. contracted to transfer the property to her grandson, M.D., for $255,000. To consummate the transaction, M.D. obtained an $80,000 mortgage loan, from which the debt on the existing mortgage and other minor settlement *982 charges were paid; the remainder of the mortgage proceeds, $10,191.71, was given to B.D. As part of this transaction, B.D. also received what has been referred to as a "lifetime lease" for the second floor/attic apartment (the apartment).
The lease stated that the compensation received by M.D. for giving B.D. a "lifetime lease" was $175,000, which purports to represent the remaining value of the property transferred to M.D. The lease defined its duration as "[f]or the life of [B.D.]," but also, within the same sentence, referred to an actuarial table. Although the record on appeal does not contain this actuarial table, the parties' stipulation indicates that B.D.'s life expectancy was then 10.83 years.
The meaning and significance of the lease term rested at the heart of the contested matter before the ALJ. In finding that the transfer was for fair market value, the ALJ provided the following analysis of B.D.'s prepayment of $175,000 in rent for the term of the lease:
At the time of the sale, [B.D.'s] life expectancy, according to the actuarial tables contained in HCFA Transmittal # 64, was 10.83 years. As such, if [B.D.] were to live for that amount of time, and rent the apartment for its fair rental value, she would have paid out a total of $194,940 in rent.[[2]] So in effect, the value of her lifetime leasehold, plus the $80,000 cash she received, earned [B.D.] approximately $20,000 more than the property's fair market value. In conclusion, this court cannot find that the sale of [B.D.'s] home was for less than fair market value.
As a result, the ALJ set aside the board's imposition of a penalty period.
The Director reversed the ALJ's decision, finding that B.D. failed to demonstrate that she received fair market value in exchange for conveying her home to her grandson. Proceeding on an assumption that the lease would terminate upon B.D.'s death or her departure from the premises, the Director concluded that the prepayment of so much rent by a woman of such age and health did not fall within the bounds of fair market value. In other words, the Director concluded that a finding that B.D. received fair market value required an assumption that B.D. would make use of the premises for a ten-year period, but failed to consider that any lesser duration of the lease  which seemed likely in the circumstances  would render the prepayment of ten years' worth of rent unconscionable. For example, if B.D. obtained the benefit of the lease for a period of ten years, then the prepayment of $175,000  without presently considering the additional value to M.D. of receiving so much rent in advance  extrapolates to a monthly rent of slightly less than $1,500 per month. Accepting as reliable B.D.'s expert report  as to which the Director was correctly dismissive[3]  it could be concluded *983 that B.D.'s retention of a full ten-year term for $175,000 might have merit since that would extrapolate to a rent payment of $1,458.33 per month. On the other hand, if B.D.'s death one year after the transfer caused a termination of the lease, she would have actually paid rent to her grandson at the rate of more than $14,500 per month  an amount no one would equate with fair market value. In light of these considerations, and the fact that B.D. was "wheelchair bound" and already in need of services through the program, the Director concluded that B.D. did not receive fair value for the lifetime lease because she would not likely occupy the premises for anywhere near 10.83 years.
The Director reached this same conclusion by analyzing the transaction from the point of view of B.D.'s grandson:
[B.D.] . . . attempts to argue that this is such a terrible deal for the grandson as "he is taking on the responsibility of the owner without having the complete freedom to use the property." The property was worth over a quarter of a million dollars two years ago. The grandson only had to come up with an $80,000 mortgage to take title. The property contains two apartments, the other of which is rented for $1,180 and alone would cover the mortgage with additional funds left over to pay taxes and upkeep. The responsibility of ownership/lack of freedom dichotomy is more aptly described as rental property, an investment vehicle which was acquired at a rock bottom price and provides income to pay the monthly expenses and will increase in value.
[Footnote deleted.]
In relying upon her own interpretation of the lease, the Director viewed the lease as having a limited duration:
Here, [B.D.'s] death or removal to a nursing home terminates her right to occupy the apartment. There is no guarantee that the lump sum pre-payment of rent will equate to valuable consideration, namely shelter for [B.D.] for the rest of her life. Her institutionalization or death prior to actuarially set life expectancy would result in a windfall to her grandson, the landlord, who can then rent out or occupy the property.
The Director also found that an early departure from the leasehold was likely because of B.D.'s status at the time:
[When] she entered into the agreement she was in a wheelchair and, by virtue of eligibility in the home and community based waiver, needed nursing home level care. As noted in the [ALJ's] [i]nitial [d]ecision, this waiver program[] is "designed to provide an array of supports and services that enable the individual at risk of placement in a nursing facility to remain in" the home.
In essence, in the Director's view, B.D. prepaid for "[a] debt she has not incurred and may not incur." The Director also concluded that B.D. would have no "recourse to recover her funds" should she be unable to utilize the premises for the alleged lifetime expectancy of 10.83 years. And implicit in the decision is the Director's determination that, but for the intent to insulate this asset through this unusual attempt at Medicaid planning, the transaction made no economic sense because B.D. had transferred fee simple for little more than something she already had: the right to reside on the property for the rest of her life.
*984 If the Director's assumptions about the meaning of the lease are accurate, then we would be satisfied with her conclusion that B.D. failed to demonstrate that her receipt of a lifetime lease, the discharge of her obligation on a $67,374.98 mortgage, and an additional $10,191.70 in cash, constituted fair value when considering she gave up a home worth $259,917, and the right to $1,180 per month in other rental income generated by the property. If this constituted a proper understanding of the transaction, then we would apply the "strong presumption of reasonableness," which "attaches to the actions of administrative agencies," In re Vey, 272 N.J.Super. 199, 205, 639 A.2d 724 (App.Div.), aff'd, 135 N.J. 306, 639 A.2d 718 (1994), and we would not be able to conclude, as B.D. urges, that the Director's decision was arbitrary, capricious, or unreasonable, Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963).
However, B.D. argues that the possibility she may die or leave the premises for a nursing home before the fulfillment of her life expectancy  an assumption upon which the Director's decision relies  is irrelevant. She claims the lease allows her to either use or sublet the premises during her life regardless of whether she is willing or able to personally occupy the premises. Moreover, B.D. claims that the lease does not terminate with her death. She argues that the lease must be interpreted as creating in her estate  should she die short of her 10.83-year life expectancy  the right to use or sublet the premises until the life expectancy period terminates. In short, B.D. argues that she and her grandson did not agree that the lease terminated on her death, but instead that it terminated upon her death or at the conclusion of 10.83 years, whichever comes later. In considering this contention and in attempting to understand the parties' agreement, we turn to what they wrote and our familiar policy that, absent more than one plausible interpretation, we enforce contracts as they are written. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717 (1960); Schor v. FMS Fin. Corp., 357 N.J.Super. 185, 191, 814 A.2d 1108 (App.Div.2002).
Considering the interests at stake, we find it surprising that the lease terms are neither elaborate nor clear. This lease, which is undated, indicates that in exchange for $175,000 M.D. agreed to "give possession" of the apartment to B.D. "for the Term." The "Term" is described as being:
For the life of [B.D.], presently age 77, actuarial life expectancy pursuant to the IRS Actuarial tables attached herewith and made a part hereof.
What the parties meant by this language is not entirely clear.
Certainly, the use of a phrase such as "for the life of" in an instrument typically symbolizes a grantor's intent to create a life estate. Restatement of Property § 107 comment e (1936). Thus, the phrase "[f]or the life of [B.D.]"  standing alone  would unambiguously express that the lease would last for B.D.'s life and terminate on her death. However, other aspects of the lease tend to suggest an intent to convey some different interest.
For example, the lease transferred to B.D. only a possessory interest; B.D. did not obtain any of the rights or obligations normally associated with the creation of a life estate in property, such as the right to receive income derived from the property, id., § 119. Here, B.D.'s right to receive rent on the first floor apartment was not retained by her after the transfer to her grandson.
Another notable provision that might suggest the conveyance may have been for *985 something less than a life estate is the subordination clause. There it is declared that the lease "shall be subordinate to all present and future mortgages" on the property, which is not of particular moment. But this provision also states that if the property is sold as a result of foreclosure "the holder of a mortgage on the [b]uilding may end this Lease" (emphasis added). Thus, the lease contemplates that future circumstances could bring an end to the term of the lease during B.D.'s lifetime.
We also observe that the record does not indicate what compensation B.D. would obtain if she could not occupy the premises through no fault of her own. For example, there is no evidence to suggest that B.D. has been named as a beneficiary of any policy of insurance providing coverage for the destruction or damage of the premises, see, e.g., id., § 123, and the lease imposes no such obligation on the landlord. This constitutes yet additional evidence that the parties may have intended to create something less than a life term for the leased apartment.
It is additionally uncertain whether the parties meant to create a life estate in the leased premises or merely a right to possession for life or for so long as B.D. continued to reside there. Generally, the conveyance of a life estate provides the grantee with the right to possess the property until death, and the grantee's decision to cease residing on the property is not normally relevant in determining when the life estate terminates. See, e.g., Fabianski v. Boutin, 117 N.H. 232, 371 A.2d 1166, 1167 (1977); 28 Am.Jur.2d Estates § 72 (2007). But, when the instrument can be construed to confer a right to possession only for so long as the grantee continues to use the premises as a home or residence, a cessation of occupancy may terminate the interest.[4] In that circumstance, it is said that the grantor has conveyed to the grantee a life estate, which is subject to either a power of termination or a limitation on its use, such as if the conveyance was to B.D. so long as she wishes to live there, or to B.D. on the condition that she reside thereon. Restatement of Property, supra, § 112, Illustrations 2 and 3. If such clear expressions were contained in the lease, the Director's concern that B.D.'s departure from the leasehold would terminate her interest in the property would have merit. Id., § 152(b).
Here, the lease contains none of the clarity expressed in the Restatement's examples, and portions of the lease are suggestive of a limitation on B.D.'s interest or M.D.'s retention of the power to terminate if B.D. no longer resided there. As revealed by the parties' stipulation, the property had been B.D.'s home for many years, and it is conceivable that the parties intended that she would continue to reside there. Moreover, the provision of the lease entitled "Possession and Use," states that M.D. conveyed to B.D. "possession of the [a]partment . . . for the Term and [B.D.] shall take possession of and use the [a]partment only as a private resident" (emphasis added). This provision suggests at least two plausible interpretations. The portion we have emphasized could be interpreted as requiring B.D.'s occupation and use of the apartment to avoid a cessation of the term. This language could also *986 have been included to bar B.D. from putting the leased premises to a non-residential use, although nothing in the record would support a suggestion that B.D. intended to operate a commercial business on the premises.
In the absence of evidence that might further illuminate the meaning of the lease's language, we hazard no guess as to its impact on B.D.'s continued retention of an interest in the leasehold if she were to cease residing there. The point is that, until the matter is fully explored at an evidentiary hearing, the Director's construction of the lease  and her holding that the lease would terminate if B.D. were to move to a nursing home or elsewhere  can neither be upheld nor rejected.[5]
In addition, the reference to the IRS actuarial table in defining the lease's duration, without explanation in the document about its relevance, only adds to the ambiguity. Certainly, this ambiguity might be resolvable if the reason for its inclusion was known. For example, the reference to the actuarial table might have been incorporated to suggest the agreement's fairness to an interested reader, i.e., the agency charged with examining the transaction for Medicaid purposes. That is, its addition may have been added to explain the potential and not the actual life of the lease term and, thus, to show that the lease is a legitimate exercise in Medicaid planning. Or, as now urged by B.D., the lease's reference to her life expectancy could have been an inartful way of defining the lease's term as enduring for at least 10.83 years regardless of the length of her life.[6] We question, but cannot decide on the limited factual record, whether there is merit in either of these possibilities.
Certainly, if the parties intended to agree upon a lease term as presently described by B.D. in this appeal  a term that does not end with B.D.'s death  there is nothing in the lease other than the citation to an actuarial table that would provide support. We are mindful of a provision in the lease which indicates that the lease is "binding on the Landlord and the Tenant and all parties who lawfully succeed to their rights or take their places." However, this provision, like most other things about this lease, is unclear. If the parties meant to memorialize what B.D. now contends, it seems odd they would not have indicated that the lease would survive B.D.'s death and that her interest would succeed to her "heirs or assigns." That phrase is notably absent from this provision or the rest of the lease, and its absence suggests that the tenant's right to possession would not survive the life of the tenant. In light of the surrounding circumstances and B.D.'s stage of life, it seems more likely that the parties had in mind the possibility that B.D.'s rights might succeed, by operation of law, to a guardian. Such a guardian would gain title to the ward's property, but the ward's death would terminate that interest and any property held by the guardian would pass to the ward's estate. If that was what the parties intended, the succession *987 clause would not necessarily support the claim that the lease term would survive B.D.'s death.
And lastly, the Director would be entitled to reject B.D.'s contention because the parties failed to describe in plain language what she now claims was the actual lease term. In other words, if it truly was the parties' intention, it would have been a simple thing for them to express that the lease would terminate in 10.83 years or upon B.D.'s death, whichever came last. Their failure to state that which can be simply and easily stated might be rather persuasive evidence that they possessed no such intention at the time.
In our exploration of the language of the lease and the parties' various contentions, it has not been our intention to intimate any view as to how the document's ambiguities should be resolved. Our intent has been to reveal the document's ambiguities in order to provide guidance for the undertaking to follow. The fact is that in light of the lease's ambiguities and uncertainties, and in light of the absence of extrinsic evidence or evidence about the surrounding circumstances in the existing record, we cannot conclude that the Director's interpretation is either correct or incorrect. The matter requires deeper analysis only available after all relevant evidence is explored at a plenary hearing. See Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 268-70, 901 A.2d 341 (2006); Atlantic N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02, 96 A.2d 652 (1953).[7]
We are satisfied, however, that if the duration of the lease is determined, after remand, as being consistent with the Director's prior assumption that the lease would terminate upon B.D.'s departure from the premises or upon her death, then we would have no cause to second-guess the Director's conclusion that fair market value was not given when B.D. prepaid $175,000 for that interest. In short, upon such a finding, the Director would be entitled to conclude that the purchase by a seventy-seven-year-old woman, who has required the program's services since 2003, of a life interest in the leased premises in exchange for the prepayment of approximately ten years' worth of rent would not constitute a fair exchange.
On the other hand, if the lease's term is found to be no less than 10.83 years from its inception regardless of when B.D. dies and regardless of how long B.D. may actually reside in the premises, then the prepayment of $175,000 for that interest may possibly constitute fair market value. Support for a finding of fair market value, however, has yet to be presented. There is no evidence in the record that would shed light on the fair market value of a 10.83-year lease term for these premises. The only evidence presented on this point was a realtor's summary opinion that $1,500 per month constituted a fair rental for a three-bedroom apartment in Kearny. The Director's conclusion that this net opinion was inadequate was correct. On remand, if the evidence supports B.D.'s contention as to the term of the lease, then she will be obligated to present additional evidence as to whether the pre-purchase of a lease of these premises for the property interest conveyed constituted fair market value.
Lastly, we reject B.D.'s contention that, through her decision in this matter, the Director engaged in rule-making without taking the appropriate administrative steps. We find there is insufficient merit *988 in this argument to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The Director's decision was not based upon her adoption of a new rule but upon her interpretation of the stipulated facts in this novel setting in light of existing rules and regulations. See N.J.A.C. 10:71-4.10. The Director has the expertise to determine the significance and sufficiency of various types of asset transfers, such as that presented in this case, and when her findings are supported by credible evidence and correct legal principles, they are entitled to our deference. See H.K., supra, 184 N.J. at 384, 877 A.2d 1218. We reverse the Director's decision not because we believe she lacked the power to make such a determination  she clearly possessed that power  but because her determination was based upon a factual record that failed to provide sufficient clarity and merely begged the question posed.
To summarize, we conclude that whether $175,000 constituted fair market value for the leasehold interest cannot be answered until the actual term of the lease is ascertained. This question requires a plenary hearing at which extrinsic evidence as to the parties' true intentions in entering into this transaction, and any other relevant evidence about the surrounding circumstances, should be presented. We, thus, reverse the final agency decision and remand the matter to the Director for further proceedings in conformity with this opinion. We, of course, do not foreclose the Director from referring the matter to the ALJ for purposes of developing the record that is required.
Reversed and remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] Judge Miniman did not participate in oral argument, but has participated in the decision with the consent of counsel.
[2] This calculation was based on an expert's one-sentence written opinion, which asserted that the fair market rental of "a three bedroom apartment in Kearny" was $1,500 per month. Crediting this expert's opinion, the ALJ concluded that B.D. had prepaid $18,000 in yearly rent for a 10.83-year period, i.e., $194,940.
[3] We share the Director's doubts about the value of the expert opinion relied on by the ALJ. The expert stated only that it was his opinion that "$1,500.00 per month is the suggested rental for a three bedroom apartment in Kearny, NJ." Without further explanation as to how this conclusion was reached, and, moreover, without any assertion as to the value of this lease, which was not a month-to-month lease but a lease for the life of a particular person, the Director correctly found it unreliable. Moreover, the evidence in the record does not suggest that the apartment leased by B.D. had three bedrooms  one of the few factual premises for the expert's opinion. Instead, comments in the record suggest that the apartment in question had either one or two bedrooms.
[4] See Battin v. Battin, 94 N.J. Eq. 497, 498-99, 120 A. 519 (E. & A.1922) (affirming o.b. the trial court's holding that a will provision, which stated the decedent's "widow . . . shall have a home at `The Anchorage,' Fairhaven, New Jersey'" did not create a life estate in that property when the widow made her home elsewhere; instead, under that circumstance, the will created only what the court referred to as "an option of user" in the property).
[5] We also observe that the deed, which memorialized the transfer of the home from B.D. to M.D., makes no mention of B.D.'s lifetime lease of a portion of the property. Had M.D. conveyed a life estate, even if only of a portion of the premises, one might expect that this limitation on fee simple would be disclosed in a recorded document.
[6] If it is ultimately determined that the parties intended  but inadequately described  that the term would be no shorter than 10.83 years, then the earliest termination date cannot be determined without knowing the inception date of the lease, which is not disclosed by the lease. In short, we cannot know when the 10.83-year period ends until we know the date it began.
[7] We note that a copy of the contract executed by B.D. to convey fee simple to M.D. is not included in the appendix, although referred to in the stipulated facts. This document may further illuminate the true meaning of the lease.