990 A.2d 701 (2010)
412 N.J. Super. 340
E.S., Petitioner-Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, Respondent-Respondent, and
Middlesex County Board of Social Services, Respondent.
DOCKET NO. A-2564-08T2.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 2009.
Decided March 26, 2010.
*703 Linda S. Ershow-Levenberg, Clark, argued the cause for appellant (Fink Rosner Ershow-Levenberg, attorneys; Ms. Ershow-Levenberg, on the brief).
Lisa Marie Albano, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Zoe J. McLaughlin, Deputy Attorney General, on the brief).
Before Judges LISA, BAXTER and ALVAREZ.
The opinion of the court was delivered by ALVAREZ, J.A.D.
Ninety-seven-year-old E.S. (petitioner) appeals the December 4, 2008 final agency decision of the Department of Human Services, Division of Medical Assistance and Health Services (Division), affirming a transfer penalty imposed on her application for Medicaid benefits. Petitioner sought the benefits to pay for the cost of her nursing home care. The transfer penalty was imposed based on a determination that a "life care contract" (LCC) between petitioner and her daughter, in which petitioner made a lump sum advance payment to her daughter for the future provision of personal care services, was not a transfer for fair market value.
Upon notification of the imposition of the transfer penalty, petitioner appealed and the case was transmitted to the Office of Administrative Law (OAL). The matter was decided by way of summary decision, over petitioner's objection, on stipulated facts and oral argument. The Administrative Law Judge's (ALJ) September 8, 2008 initial decision upholding the imposition of the transfer penalty was adopted and amplified on December 4, 2008 by the Division. This appeal followed. We affirm.

I.
When the Middlesex County Board of Social Services (Board) advised petitioner of the transfer penalty on February 28, 2008, it was due to, among other items, the advance payment of $56,550 on account of the LCC, to her daughter E.K. during the look-back period. The look-back period is a fixed term of months preceding an application for Medicaid benefits in which transfers of assets or income are closely scrutinized to determine if they were made for the sole purpose of Medicaid qualification.[1]See H.K. v. State, 184 N.J. 367, 380, 877 A.2d 1218 (2005) (citations omitted); N.J.A.C. 10:71-4.10(b)9(ii), (b)9(iv).
A transfer penalty is the delay in Medicaid eligibility triggered by the disposal of financial resources at less than fair market *704 value during the look-back period.[2]See H.K., supra, 184 N.J. at 380, 877 A.2d 1218. Congress's imposition of a penalty for the disposal of assets or income for less than fair market value during the look-back period is intended to maximize the resources for Medicaid for those truly in need. See Estate of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J.Super. 210, 219, 861 A.2d 138 (App. Div.2004), certif. denied, 182 N.J. 425, 866 A.2d 982 (2005). New Jersey has codified the formula for calculation of the length of the transfer penalty at N.J.A.C. 10:71-4.10(c) and (m)1.
E.K., who holds a durable power of attorney for petitioner, entered into the LCC, on behalf of petitioner, on September 26, 2007. She named herself as the designated "caregiver" who was to receive a payment of $56,550 for services to be rendered to her mother, the "resident," as specified in the LCC. Although throughout this opinion we refer to petitioner as the party in interest, in reality, it is E.K. who is pursuing the appeal.
Petitioner entered a nursing home in June 2007 and initially paid the costs from her own funds. E.K. applied for Medicaid benefits on petitioner's behalf shortly thereafter.[3] Petitioner has at least one other child still living.
The $56,550 payment was calculated by applying the following formula, described in the LCC:
$25 per hour × 15 hours per week × 52 weeks per year × 2.9 years
According to petitioner, the hourly rate is at the lowest end of the pay scale for comparable personal care services to nursing home residents and fifteen hours per week is the estimated time necessary to provide the enumerated services. Petitioner's 2.9-year life expectancy is taken from the Periodic Life Table promulgated by the Social Security Administration and a table contained in Transmittal 64, published by the Center for Medicare and Medicaid Services (CMS).[4]See Transmittal Number 64, State Medicaid Manual, Life Expectancy Tables-Males,[5]available at http://www.sharinglaw.net/elder/ transmittal64.htm.
Although the "preliminary statement" to the LCC refers to compensation for services being at "market rate," and to the "wish to manage" the relationship between E.K., the "caregiver," and petitioner, the "resident," "in a business-like fashion," it includes the following:
SECTION 3. THE CAREGIVER IS NOT OBLIGATED TO DEVOTE FULL TIME TO THE RESIDENT'S CARE. The Resident and the Caregiver recognize and acknowledge that the Caregiver has her own professional or familial responsibilities to career and family. The Caregiver is, therefore, not obligated to devote her entire time, attention and energies to the business of the Resident. The Caregiver shall, to the best of her ability, devote as much of her time that is not devoted to career and family to fulfill her obligations under this Contract. However, the Caregiver *705 shall be on-call at all times and available to assist the Resident within a reasonable period of time after being contacted by the Resident or by a staff person of a facility in which she resides.
. . . .
SECTION 11. COMPENSATION. The Resident shall pay and the Caregiver agrees to accept, in payment of the aforesaid services to be rendered by the Caregiver, the compensation as computed below, which compensation the parties stipulate and agree to be fair, reasonable and of fair market value, commensurate with the quality and extent of the services provided.

11.1 Hourly Rate. The parties acknowledge that home health care aides who perform the services noted above generally receive $20.00 per hour and that geriatric care managers who perform such services on a contractual basis normally receive in excess of $100.00 per hour for their professional services. It is stipulated that the Caregiver receive $25.00 per hour.

11.2 Number of Hours. The services to be performed by the Caregiver are to be furnished on an "as needed" basis over the whole of the lifetime of the Resident and, therefore, the hours that the Caregiver will in fact expend in performance of the Caregiver's duties will vary from time to time over such lifetime. At times it may be necessary for the Caregiver to perform 40 or more hours of services per week, and at times less than that. The parties stipulate that, over the lifetime of the Resident, it is expected that the average time which the Caregiver will expend will be 15 hours per week or more.
. . . .

11.5 Payment. As shown above, the total amount payable to the Caregiver hereunder is $56,550.00. The Caregiver may elect to receive payment over more than one tax year, but the full amount due is not dependent upon the precise amount of work performed in any tax year, as the Resident's obligation accrues upon signing of this Contract. The Resident agrees that the unpaid portion shall be a claim against her estate at the time of death, regardless of whether she lived longer than 6.2[sic] years from the date this contract is signed.
. . . .
SECTION 13. CANCELLATION OF AGREEMENT. This Agreement may be canceled only as set forth in this Section.
. . . .

13.2 Death of The Resident. Except as provided hereinabove, the term of this Agreement shall commence on the date hereof and shall continue in full force and effect thereafter until the death of the Resident. Any amount still owing shall constitute a claim against the estate.

13.3 Cancellation By The Caregiver. The Caregiver shall have the right to terminate this Contract upon ninety (90) days notice.

13.4 The Caregiver's Compensation Upon Cancellation By The Resident. If the Contract is canceled under Paragraph 13.1, then the Caregiver shall receive compensation for past services rendered at the fair market rate payable to home health care aides at the time at which the services were rendered. For purposes of compensation, it shall be assumed hereunder that the Caregiver rendered 15 hours per week of care to the Resident, and the amount of compensation shall be computed thereupon.
SECTION 14. PERSONAL NATURE. The Resident may not assign, transfer, convey, hypothecate or otherwise *706 alienate any rights or benefits, damages, costs and expenses the Resident is to obtain or could obtain under this Agreement to any third party. This Agreement is for services unique to the Resident and the Caregiver shall have no obligation to render services or otherwise be liable to any other person or entity.
[Emphasis added.]

II.
Local social service boards screen Medicaid applications pursuant to regulations adopted by the Commissioner of Medical Assistance and Health Services. N.J.S.A. 30:4D-7a; N.J.A.C. 10:71-3.11, -3.15. All includable income and resources must fall below certain limits in order for an applicant to be deemed eligible for Medicaid benefits. See 42 U.S.C.A. § 1396; 42 U.S.C.A. § 1396a(a)(10)(A). See also N.M. v. Div. of Med. Assistance & Health Servs., 405 N.J.Super. 353, 359, 964 A.2d 822 (App.Div.2008). Local social service boards must comply with the relevant statutes and regulations in order to ensure that New Jersey's citizens continue to have access to federal funding for medical assistance. See 42 U.S.C.A. § 1396a(a)(5).
"Resource" is defined as "real or personal property which is owned by the applicant.... and which could be converted to cash to be used for his/her support and maintenance." N.J.A.C. 10:71-4.1(b). See also Supplemental Security Income for the Aged, Blind and Disabled, 20 C.F.R. § 416.1201 (2009). If any of the applicant's resources are transferred for less than fair market value during the look-back period, they are included in the eligibility analysis as funds available to the applicant. See 42 U.S.C.A. § 1396p(c)(1)(A); N.J.A.C. 10:71-4.10(a). This inclusion results in delayed eligibility, in other words, in the imposition of a transfer penalty. 42 U.S.C.A. § 1396p(c)(1)(A) and (E); N.J.A.C. 10:71-4.10(a).
Fair market value is defined as:
an estimate of the value of an asset, based on generally available market information, if sold at the prevailing price at the time it was actually transferred. Value shall be based on the criteria for evaluating assets as found in N.J.A.C. 10:71-4.1(d).
[N.J.A.C. 10:71-4.10(b)6.]
The criteria referred to in the regulation includes the price an item "can reasonably be expected to sell for on the open market in [a] particular geographic region." N.J.A.C. 10:71-4.1(d). See also Supplemental Security Income for the Aged, Blind and Disabled, 20 C.F.R. §§ 416.1101, 416.1246 (2009).
Medicaid funds are limited, earmarked for those truly in need. See Estate of DeMartino, supra, 373 N.J.Super. at 219, 861 A.2d 138. Implementation of this congressional policy ensures that only applicants whose income and resources fall below a specified level will qualify.

III.
On judicial review of an agency decision, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't, Twp. of W. Orange, 338 N.J.Super. 493, 496, 769 A.2d 1112 (App. Div.2001) (citing Henry v. Rahway State Prison, 81 N.J. 571, 580, 410 A.2d 686 (1980)). See also Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15-16, 890 A.2d 922 (2006) (citations omitted). The agency decision must be supported by substantial credible evidence in the record as a whole. Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 10, 970 A.2d 347 (2009) (quoting Mazza v. Bd. *707 of Trs., 143 N.J. 22, 25, 667 A.2d 1052 (1995)). It must not offend either the state or federal constitution and must be in accord with the agency's legislative mandate. See ibid. (citations omitted). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J.Super. 440, 443-44, 897 A.2d 442 (App.Div.), certif. denied, 188 N.J. 219, 902 A.2d 1236 (2006) (citations omitted). See also Barone v. Dep't of Human Servs., 210 N.J.Super. 276, 285, 509 A.2d 786 (App. Div.1986), aff'd, 107 N.J. 355, 526 A.2d 1055 (1987) (citations omitted).

IV.
Petitioner first contends that material facts in dispute required a full hearing before the ALJ, not a summary decision, and that a remand is therefore necessary. In this case, the ALJ decided the matter on seven facts stipulated by both parties:
1. Petitioners[6] have each entered into a similar written "Life Care Contract" with a family member for personal-care services, and, pursuant to the contract, ... E.S. prepaid $56,550.
2. The contracts were executed and payments made during the "look-back period."
3. The length of each contract is based upon the actuarial life expectancy of each petitioner, but the family member with whom each petitioner contracted remains obligated to continue to provide services without receipt of further payment, even if a petitioner outlives her actuarial life expectancy, and the family member receives a windfall if a petitioner dies prematurely.
4. The services to be provided by a family member to each petitioner under the contract are solely and exclusively for the benefit of that petitioner and may not be assigned or transferred to anyone else.
5. Petitioners are elderly individuals within the meaning of the regulations governing the Medicaid program.
6. Petitioners have each applied for institutional Medicaid benefits and have been denied.
7. As a result of the prepayments made pursuant to the contracts, each county welfare agency determined that each petitioner transferred resources for less than fair market value in order to become eligible for institutional Medicaid benefits and imposed a transfer penalty.
A summary decision in an administrative proceeding is appropriate where the pleadings, discovery and affidavits "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." N.J.A.C. 1:1-12.5(b). We apply the same standard of review on appeal as we would to the grant of summary judgment under Rule 4:46-2(c). Contini v. Bd. of Educ. of Newark, 286 N.J.Super. 106, 121, 668 A.2d 434 (App.Div.1995), certif. denied, 145 N.J. 372, 678 A.2d 713 (1996).
A genuine issue of material fact exists when "`the competent evidential materials... are sufficient to permit a rational fact[-]finder to resolve the alleged disputed issue in favor of the non-moving party.'" Piccone v. Stiles, 329 N.J.Super. 191, 194, 747 A.2d 296 (App.Div.2000) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995)). Further, "`[a]n issue of fact is genuine only if, considering *708 the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Id. at 195, 747 A.2d 296 (quoting R. 4:46-2(c)).
Petitioner asserts that a material fact in dispute was the Division's position that the LCC was not a contract under New Jersey law. The ALJ's decision explicitly notes, however, that the Division did "not challenge the validity of the [LCC], and even concede[d] that these contracts may have value." Another alleged issue of material fact is whether the hourly compensation rate selected by E.K. is fair. The amount is of no consequence, as the rate does not add anything to the analysis of whether the LCC had any fair market value. The facts petitioner claims are material are in reality mere straw menfacts neither challenged by the Division nor relevant to the overarching legal question.
In reaching their conclusions, both the ALJ and the Commissioner relied solely on the stipulations, on the terms contained within the four corners of the LCC, and relevant law. The facts petitioner asserts create material disputes requiring a full hearing were of no consequence to the determination from which this appeal is taken. Hence, the ALJ's determination to proceed by way of summary disposition was warranted and the Division's endorsement of the procedure was not error.

V.
Petitioner next challenges the agency decision on the basis that the Director did not accord any fair market value to the LCC, and that he compounded the mistake by doing so in the absence of a hearing. As we shall discuss, the agency decided the question properly because the LCC indeed has no fair market value. It was merely a vehicle disposing of an applicant's assets in preparation for the Medicaid application process and that determination in this case did not require a hearing.
New Jersey has codified the federal Medicaid guidelines, which "provide that if an institutionalized individual ... disposes of assets for less than fair market value on or after the look-back date ..., the individual is ineligible for medical assistance." 42 U.S.C.A. § 1396p(c)(1)(A). See also N.J.A.C. 10:49-5.3(a). The enumerated services include nursing home care. 42 U.S.C.A. § 1396p(c)(1)(A). Only if the transfer was made for fair market value was petitioner entitled to medical assistance. Ibid.; N.J.A.C. 10:71-4.7(a).
Petitioner relies upon Reed v. Missouri Department of Social Services, Family Support Division, 193 S.W.3d 839 (Mo. App.Div.2006) and Brewton v. State Department of Health & Hospitals, 956 So.2d 15 (La.Ct.App.2007) in support of the proposition that the LCC had fair market value. In both of these cases, similar LCCs were not found to trigger a transfer penalty. Both purport to analyze the value of similar agreements after the date of application for Medicaid benefits. See Reed, supra, 193 S.W.3d at 841; Brewton, supra, 956 So.2d at 16-17. They are distinguishable on that basis alone, as the snapshot moment for assessment of whether an asset was transferred for less than fair market value is at the time of application, not after. 42 U.S.C.A. § 1396p(c)(1)(B)(i); N.J.A.C. 10:71-4.10(a).
Additionally, as the Division counters, the cases completely ignore Congress's attempts to regulate devices created solely to shelter assets, and/or income, during the spend-down period, in preparation for application for Medicaid benefits. See, for example, 42 U.S.C.A. § 1396a(k)(2) (defining *709 prohibited "Medicaid qualifying trusts"); 42 U.S.C.A. § 1396p(d) (specifying techniques for the creation of a trust for persons under sixty-five who are disabled, which trusts are permissible in some instances). See also 42 U.S.C.A. § 1320a-7b(a)(6); Cohen v. Comm'r of the Div. of Med. Assist., 423 Mass. 399, 668 N.E.2d 769, 772 (1996). In fact, the DRA was enacted by Congress in 2005 for the purpose of preventing applicants from spending down their assets for the sole purpose of qualifying for Medicaid benefits:
By enactment of the DRA, Congress undertook to close loopholes in the federal statutory provisions governing the Medicaid program that had allowed individuals with sufficient assets to pay for their own medical care to qualify for Medicaid.... Representative Joseph Barton of Texas, stated that enactment of the DRA would "make it more difficult to hide assets so that wealthy clients can pretend to be poor to qualify for long-term Medicaid coverage in nursing homes."
[N.M., supra, 405 N.J.Super. at 362-63, 964 A.2d 822 (citations omitted).]
In our view, Reed and Brewton are not dispositive, and petitioner's reliance upon the cases is misplaced.
Petitioner also suggests that the fact E.K. entered into the contract with herself is of no consequence under the authority of In re Keri, 181 N.J. 50, 853 A.2d 909 (2004). Keri is enlightening, but not for the proposition petitioner urges.
In Keri, an incompetent's court-appointed legal guardian sought approval for a Medicaid spend-down plan including a payment of $92,000 to be shared equally between the guardian and his brother, the sole heirs named in the incompetent's will. Id. at 55, 853 A.2d 909. An additional $78,000 remained from the guardian's sale of the incompetent's home. Those funds were earmarked to pay the incompetent's nursing home bills during the fifteen-month period of Medicaid ineligibility, i.e., the transfer penalty. The penalty was triggered by the transfer for less than fair market value of the $92,000 outright payment to the sole heirs. Ibid. The guardian's plan was approved because the "Medicaid spend-down plan [did] not interrupt or diminish [the] ward's care, involve[d] transfers to the natural objects of [the] ward's bounty, and [did] not contravene an expressed prior intent or interest." Id. at 61-62, 853 A.2d 909. Additionally, Keri was decided prior to the adoption of the DRA in 2006. There are significant distinctions between the facts in Keri and the circumstances in this case.
The LCC in this case triggers a transfer penalty without otherwise providing for petitioner's care, unlike the circumstances in Keri. Another difference is that here there are at least two natural objects of petitioner's bounty, as petitioner has at least one other child living besides E.K., and she is left out of any distribution made to E.K. Furthermore, in Keri the guardian sought approval of the plan, with notice to all interested parties, prior to disbursement. Id. at 55, 853 A.2d 909. That preliminary step was not taken here.
A resource or asset is defined as "`any real or personal property which is owned by the applicant ... and which could be converted to cash to be used for his/her support and maintenance.'" H.K., supra, 184 N.J. at 380 n. 3, 877 A.2d 1218 (citations omitted). Generally, "a conveyance made during the look-back period raises a rebuttable presumption that the resource was transferred for the purpose of establishing Medicaid eligibility," thereby triggering a transfer penalty. Ibid.
The Administrative Code defines fair market value as "an estimate of the value *710 of an asset, based on generally available market information, if sold at the prevailing price at the time it was actually transferred." N.J.A.C. 10:71-4.10(b)6. In other words, "[t]he value of a resource shall be defined as the price that the resource can reasonably be expected to sell for on the open market in the particular geographic area minus any encumbrances." N.J.A.C. 10:71-4.1(d).
The LCC includes a provision which prohibits the assignment, transfer, or conveyance of the contract to any other party. Given those contractual restrictions, the LCC has no determinable fair market value whatsoever as defined by the Administrative Code.
Even if it were transferable, the LCC has no fair market value as defined by the Administrative Code because it exposes anyone standing in the petitioner's shoes to such unwarranted risks. Only the caregiver reaps benefits from this contract. Were the contract to be cancelled by the resident, the caregiver "shall receive compensation for past services rendered at the fair market rate payable to home health aides ... it shall be assumed [ ] that the Caregiver rendered 15 hours per week of care to the Resident...." In other words, the caregiver is to be paid regardless of actual performance.
Should the "resident" die, the caregiver is entitled to full payment, regardless of services rendered. Should the caregiver die the day after receipt of the full payment on the first day of the contract, her estate can retain whatever funds remain although no services were rendered, as there is no recoupment even under those circumstances. When the resident dies, any amount still owing of the $56,550 "constitute[s] a claim against the [resident's] estate."
As the Director opined, few would enter into a contract such as the LCC that expressly allows an employee to tend to their other "professional" and "familial" responsibilities at the expense of their job performance. The lump sum payment was calculated through the application of a formula including a minimum number of hours per week with no corresponding duty imposed upon the caregiver to perform a minimum number of hours weekly in services. The LCC is worthless on the open market; it is specious to suggest otherwise. The Director correctly applied pertinent statutes and regulations, which indisputably redlined the transfer in this case as one for less than fair market value.
"It is settled that `[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div.2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J.Super. 93, 102, 704 A.2d 562 (App. Div.1997)). The Division is entrusted with the responsibility of implementing federal and state law so as to not jeopardize the eligibility of New Jersey residents for federal Medicaid funding. N.J.A.C. 10:71-2.2(a), (b).
The Director's eminently reasonable conclusion that the arrangement here did nothing more than shelter petitioner's assets for the benefit of E.K., and was a transfer for less than fair market value, was based on substantial credible evidence in the record. It advances the agency's legislative mandate and in no way offends either the federal or state constitutions. The LCC stands in stark contrast to the monthly personal needs allowance a Medicaid recipient in a nursing home is entitled to retain$35. N.J.S.A. 30:4D-6a.

VI.
Petitioner also contends that the State cannot adopt a methodology more restrictive *711 for Medicaid purposes than that which is authorized for payment of SSI benefits. This argument also lacks merit. SSI statutes and regulations do not address nursing home care benefits for persons over sixty-five. 42 U.S.C.A. § 1381a; 42 U.S.C.A. § 1382c. Therefore, the fact that 42 U.S.C.A. § 1396a(r)(2)(A) states that methodologies employed in determining income and resource eligibility may not be more restrictive than those for SSI is not relevant to these issues. Furthermore, the argument was not made either before the ALJ or the Director. We therefore do not address it further. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).

VII.
Petitioner next claims that the rejection of the LCC in this case constitutes ad hoc rulemaking in violation of the principles enunciated in Metromedia, supra, 97 N.J. at 329-30, 478 A.2d 742. This argument is also unpersuasive. The Supreme Court in Metromedia held, for due process reasons, that an administrative agency must conduct formal rulemaking before imposing new standards upon those that it regulates. Id. at 330-31, 478 A.2d 742. Six factors guide the analysis of when such formal rulemaking is necessary:
(1) [the decision] is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2)[it] is intended to be applied generally and uniformly to all similarly situated persons; (3) [it] is designed to operate only in future cases, that is, prospectively; (4) [it] prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) [it] reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) [it] reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
[Id. at 331-32, 478 A.2d 742.]
These factors, "either singly or in combination," determine whether agency action amounts to the promulgation of an administrative rule. Id. at 332, 478 A.2d 742.
Having considered each of these enumerated Metromedia factors, we are satisfied that the decision to reject the LCC in this case was an unassailable exercise of the agency's pre-existing authority that falls well outside the scope of Metromedia. It affects a small fraction of Medicaid beneficiaries and involves the application of unambiguous statutory and regulatory requirements of long standing. There is no Metromedia violation here, and accordingly no violation of due process.

VIII.
Lastly, petitioner seeks payment of attorney's fees pursuant to 42 U.S.C.A. §§ 1983 and 1988 as a result of the agency's allegedly arbitrary and capricious violation of established law and her civil rights. Procedurally, we are not inclined to consider this claim, as it was not made before either the ALJ or the Director. Nieder, supra, 62 N.J. at 234, 300 A.2d 142. In any event, it is so lacking in merit as to not warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Prior to the adoption of the Deficit Reduction Act (DRA) on February 8, 2006, the look-back period was thirty-six months; the DRA extended the look-back period to sixty months. 42 U.S.C.A. § 1917(c)(1)(B)(i); DRA, Pub.L. No. 109-171, DRA § 6011. Currently, most counties continue to apply the thirty-six-month requirement, although it is anticipated that all New Jersey counties will be employing the sixty-month term by 2011. Department of Medical and Health Services, New Jersey Medicaid Program Eligibility, June 12, 2009, http://www.state.nj.us/human services/dmahs/clients/medicaid/medicaid_pro-gram_eligibility.pdf.
[2] There is a discrepancy as to the transfer penalty imposed. Petitioner's brief asserts it is 258 days, while the Division's brief contends it is two months and thirteen days.
[3] We were unable to ascertain from the record the exact date of the Medicaid application.
[4] CMS arrived at eligibility requirements for Medicaid consistent with the federal statutory scheme and a reasonable exercise of power delegated to it by Congress. Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460, 469 (1981).
[5] The tables employed to calculate petitioner's life expectancy were for men.
[6] This action was initiated by three similarly situated petitioners, all of whom entered into precisely the same LCCs, drafted by petitioner's counsel, and were also represented by petitioner's counsel. E.S. was the only petitioner who filed an appeal.