**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5665-17T4

J.B.,

      Petitioner-Appellant,

v.

CAMDEN COUNTY BOARD
OF SOCIAL SERVICES, and
DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES,

      Respondent-Respondent.

_____

Submitted September 12, 2019 – Decided May 5, 2020

Before Judges Nugent and Suter.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Stotler Hayes Group, LLC, attorneys for appellant (Nikoleta Tzaferos, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney

General, of counsel; Arundhati Mohankumar, Deputy
Attorney General, on the brief).

PER CURIAM

This case involves an application for Medicaid benefits. The applicant, petitioner J.B., appeals from the final decision of the Director, Division of Medical Assistance and Health Services (the Director), imposing a penalty of 329 days because petitioner sold her home for less than fair market value during the "look-back" period reviewed for Medicaid eligibility for institutional benefits.[1] The Director determined petitioner failed to overcome her burden of rebutting the presumption that the transfer was made to establish Medicaid eligibility and imposed a transfer penalty.

Because the Director's determination that petitioner sold her home to establish Medicaid eligibility is supported by substantial credible evidence in the record, we affirm that part of the decision. Because the Director's decision concerning the penalty is contrary to the findings of an Administrative Law Judge (ALJ) but does not explain the Director's rejection of the ALJ's findings, we vacate the penalty and remand for further proceedings.

---

[1] The application for Medicaid, the administrative proceedings, and this appeal have been filed on petitioner's behalf by the skilled nursing facility where petitioner was admitted before her Medicaid application was filed.

I.

A.

The following facts are undisputed. Petitioner was admitted to a skilled nursing facility in September 2016. When admitted, she owned a home in Brooklawn. Following petitioner's admission to the nursing facility, her son decided to apply on her behalf for Medicaid benefits. Personnel at the facility informed him petitioner could have no assets when the Medicaid application was filed. Utilizing a power of attorney, petitioner's son sold her home in November 2016—two months after her admission to the facility and one month before petitioner applied for Medicaid benefits—to a realtor and former high school classmate for $17,500, considerably below its tax assessed value of $104,700.

Following the filing of petitioner's December 2016 Medicaid application, the Camden County Board of Social Services (Camden Board or Board) imposed a 236-day penalty, starting from petitioner's eligibility date of January 1, 2017, because her house was sold for less than fair market value. Dissatisfied with the Camden Board's final decision, petitioner requested a Fair Hearing concerning the penalty, and the matter was transferred to the Office of Administrative Law for a Fair Hearing before an administrative law judge (ALJ).

3

The parties' primary disputes before the ALJ were the value of petitioner's home when it was sold in November 2016, and whether petitioner sold the home below its market value to establish Medicaid eligibility. During the hearing, a Human Services Specialist for the Camden Board testified petitioner had not supported her application to the Camden Board that her home was in poor condition and that $17,500 was its fair price when she sold it. After the Camden Board notified petitioner of that deficiency, she submitted a realtor's comparative market analysis, which the Board rejected because it was not an appraisal.

The Camden Board assessed petitioner's home by applying an equalization ratio to the home's tax assessed value and giving petitioner a credit for the purchase price of $17,500. The Human Services Specialist testified before the ALJ that the Camden Board initially applied the wrong equalization ratio, but using the correct ratio, the penalty should be approximately 130 days. She also testified petitioner had provided to the Camden Board neither a comparable market analysis nor a certified appraisal until after the Camden Board sent petitioner the letter notifying her of the penalty. Nor did petitioner provide the Camden Board with any photographic evidence of the home's condition before it was sold or when it was sold.

4

Petitioner presented the testimony of her son, his wife, his friend who had purchased the property, and a licensed appraiser. Petitioner's son testified petitioner's health began to fail in September 2015. She developed a severe condition and underwent surgery. She was never again healthy enough to return home.

Petitioner's son and his wife testified the home was in deplorable condition. According to them, petitioner had become a "hoarder." For example, when they went to petitioner's home after she underwent surgery and was hospitalized, they found "boxes, books, clothing items piled from floor to ceiling on both sides of the porch" and in the home's interior. Only a "narrow trail" enabled one to walk through the living room. The interior of the house smelled of animal and human waste and was infested with bugs. According to petitioner's son, "the only real usable living space that my mom had left was a small section of her couch where she would sleep kind of curled up." Otherwise, the rooms were covered with "stacks of newspaper, plates with cat food on them that was rotting, bugs all over the place, [and] there was another huge pile of cat litter at the side of one of these little trails going up the steps."

In addition, broken and leaking pipes had caused water damage throughout the home. Considerable damage was visible throughout both floors

of the house. No appliances worked, the plumbing did not work, there was no air conditioning, and the heat was unreliable.

According to petitioner's son, he and his wife spent "from mid October 2015 up until the spring of 2016 just to get the house cleaned out." Neither petitioner's son nor his wife, however, took photographs or video of the interior of the home.

The realtor who purchased the home for $17,500, a former high school classmate and current "acquaintance" of petitioner's son, testified he routinely "flipped" homes. He, too, described the deplorable condition of the home when he first inspected it after petitioner's son contacted him.

The realtor decided to purchase the home as an investment, which he did for $17,500. He claimed the price was a fair market value for the home. He claimed to have spent "in the low to mid 30's" to compete what he described as "pretty much a complete interior remodel," replacing all the windows, the heater, and all the drywall. Yet, he acknowledged he was "not the best record keeper," and produced only approximately $5000 in receipts, along with a report from a construction company, in which he had an ownership interest, showing a cost of services of $26,750. He sold the home for $53,000.

A-5665-17T4

The realtor prepared a comparative market analysis for petitioner's home. Based on that analysis, he opined the property should be listed for $25,000 and sold for between $18,000 and $25,000. During the hearing before the ALJ, the realtor testified he knew the appraiser appraised petitioner's home in September 2017 at $78,000. He felt this value "was a little high," but it was "definitely in the range because . . . [the property] was now an occupied property with a renter . . . ."

Petitioner's appraiser was a "licensed real estate appraiser, residential certified." She appraised petitioner's home on September 28, 2017—ten months after its sale—for $78,000. She said the appraisal would have been lower had it taken place either before improvements were made or had she known "the property was a hoarding situation and required a significant amount of repairs." During cross-examination, the appraiser admitted she could not say with any certainty what the actual value of petitioner's home was at the date of the sale, November 21, 2016. She also explained she was unable to appraise petitioner's home "retroactively" to the date of its sale, because between its sale and the date her office was contacted to do the appraisal, the home had been renovated.

Among other facts, the ALJ determined that when petitioner's son and his wife went to her home after her September 2015 hospitalization, they "found the

7

residence in poor condition." The ALJ also found it took petitioner's son and his wife several months to clean the residence.

Concerning the realtor's comparative market analysis, the ALJ found it was a marketing tool rather than an appraisal. In contrast, after noting the 2017 tax assessed value was $84,000, the ALJ determined the 2017 appraisal of the property for $78,000 was an "independent appraisal." Although the ALJ found that the realtor who purchased the property for $17,500 had work done on the property by his company before he resold it, the judge also found the realtor had provided no "supporting documentation or cost of line item breakdown . . . substantiating the work performed on the property by the company as set forth in the site report."

The ALJ had no doubt petitioner's home was in poor condition when her son sold it, but the judge noted the absence of photographic evidence of the home "in its dilapidated and uninhabitable state" prior to its sale. The ALJ further noted the only document petitioner provided to rebut the presumption the property was not sold at its fair market value was the realtor's comparative market analysis; an analysis which, according to the ALJ was not performed in accordance with the Uniform Standards of Professional Appraisal Practice and could not be used as an appraisal. The ALJ rejected the comparative market

A-5665-17T4

analysis as a purported credible source of the property's fair market value when sold.

The ALJ found two credible sources of petitioner's home's equity value at the time of the home's sale: "the property tax records and the certified appraisal which was not provided until the hearing date."   Noting the Camden Board's Specialist "stipulated that the certified appraisal would suffice," the ALJ accepted the appraised value of $78,000 as "the appropriate value for the property."  The ALJ expressly rejected the tax assessed value.  Deducting the $17,500 sale price, the ALJ imposed a penalty in the amount of $60,500, which equated to a 142-day penalty period.

## B.

Following petitioner's filing of exceptions to the ALJ's initial decision, the Director reviewed the entire record and issued a final agency decision in May 2018.  The Director adopted the ALJ's initial decision but modified the penalty to $109,522.09, equating to 329 days.  The Director determined petitioner had "offered no corroborating evidence to establish that these transfers were done for a purpose other than to qualify for Medicaid benefits, nor was she able to rebut the presumption that the transfers were for less than fair market value."

A-5665-17T4

The Director added that in the absence of competent evidence establishing the home's fair market value, the New Jersey Administrative Code provided a basis for determining a property's residential value. The Director computed the home's adjusted fair market value when sold at $127,022.04, based on the 2016 Table of Equalized Valuations used by Camden County. Accordingly, the Division assessed a penalty of $109,522.09, equating to a penalty of 329 days.

On appeal, petitioner argues the Director's decision must be reversed because it fails to consider "any or all of the evidence presented at the Fair Hearing." Petitioner also argues the Director's decision is unsupported by the law, and the Division miscalculated the penalty.

II.

A.

Our review of agency determinations is limited. In re Stallworth, 208 N.J. 182, 194 (2011). When reviewing findings of fact, we must determine whether such findings could reasonably have been reached on "sufficient" credible evidence present in the record considering the proofs as a whole, giving "due regard" to the ability of the factfinder to judge credibility. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965).

We also generally "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). For that reason, we ordinarily will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." Ibid. "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

In this case, we must review the Division's determination that petitioner sold her home for less than fair market value to become eligible for Medicaid. We must also review the penalty the Division imposed.

Enacted in 1965 as Title XIX of the Social Security Act, Medicaid "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." L.M. v. Div. of Med. Assistance & Health Servs., 140 N.J. 480, 484 (1995) (quoting Atkins v. Rivera, 477 U.S. 154, 156 (1986)). "The program is a cooperative federal-state endeavor in which the federal government provides 'financial assistance to

11

States that choose to reimburse certain costs of medical treatment for needy persons.'" Ibid. (quoting Harris v. McRae, 448 U.S. 297, 301 (1980)). Participating States "must develop a plan that includes 'reasonable standards . . . for determining eligibility for and the extent of medical assistance . . . [that is] consistent with the objectives' of the Medicaid program." Ibid. (alteration in original) (quoting 42 U.S.C.A. § 1396a(a)(17)(A)). The Department of Human Services is the agency designated to administer Medicaid in New Jersey. N.J.S.A. 30:4D–3c. County Welfare Agencies are responsible for determining income and resource eligibility when an applicant is receiving institutional care. N.J.S.A. 30:4D-7a; N.J.A.C. 10:71-3.15(a).

Applicants for Medicaid benefits must meet the eligibility requirements of the State in which they live. L.M., 140 N.J. at 484 (quoting Schweiker v. Gray Panthers, 453 U.S. 34, 36-37 (1981)). To be eligible for Medicaid in New Jersey, an applicant must generally have $2000 or less in resources: "participation in the program shall be denied or terminated if the total value of an individual's resources exceeds $2000." N.J.A.C. 10:71-4.5(c). Resources include "any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his or her support and maintenance." N.J.A.C. 10:71-4.1(b).

If an applicant has disposed of assets within five years of applying for Medicaid or becoming institutionalized in certain facilities, the individual is ineligible for Medicaid's institutional level benefits, which include those sought in this case by petitioner. The relevant regulation states:

> An individual shall be ineligible for institutional level services through the Medicaid program if he or she (or his or her spouse) has disposed of assets at less than fair market value at any time during or after the 60-month period immediately before:
>
> > 1. In the case of an individual who is already eligible for Medicaid benefits, the date the individual becomes an institutionalized individual; or
> >
> > 2. In the case of an individual not already eligible for Medicaid benefits, the date the individual applies for Medicaid as an institutionalized individual.
>
> [N.J.A.C. 10:71-4.10(a).]

If an individual has disposed of assets during this five-year look-back period for the purpose of establishing eligibility for Medicaid, the individual is subject to a transfer penalty. "A transfer penalty is the delay in Medicaid eligibility triggered by the disposal of financial resources at less than fair market value during the look-back period." E.S. v. Div. of Med. Assistance & Health

Servs., 412 N.J. Super. 340, 344 (App. Div. 2010) (citing H.K. v. State of N.J. Dep't of Human Srvs., 184 N.J. 367, 380 (2005)).

Applicants who have transferred assets for less than fair market value within the five-year look-back period are presumed to have made the transfer to establish Medicaid eligibility. N.J.A.C. 10:71-4.10(i). "Fair-market value shall be an estimate of the value of an asset, based on generally available market information, if sold at the prevailing price at the time it was actually transferred." N.J.A.C. 10:71-4.10(b)(6).

Applicants "may rebut the presumption . . . by presenting convincing evidence that the assets were transferred exclusively (that is, solely) for some other purpose." N.J.A.C. 10:71-4.10(j). "[T]he burden of proof shall rest with the applicant." Ibid. "Evidence of good faith effort to transfer the asset at fair market value" is one factor that, "while not conclusive, may indicate that the assets were transferred exclusively for some purpose other than establishing Medicaid eligibility for long term care services[.]" N.J.A.C. 10:71-4.10(k)(3).

B.

Considering petitioner's arguments in light of our standard of review and the foregoing regulatory provisions, we find the record amply supports the Director's determination J.B. failed to rebut the presumption she transferred her

home for less than fair market value to establish Medicaid eligibility. Even were we to accept petitioner's realtor's comparative market analysis as equivalent of fair market value—and we do not—the analysis exceeded the $17,500 the realtor paid to purchase the property. The realtor's opinion that $17,500 was a fair market value was subject to substantial questions of credibility, including the realtor's relationship with petitioner's son, the realtor's motivation to minimize the purchase price in order to maximize his profit when he "flipped" the house, and the realtor's lack of credentials as a qualified appraiser. These and other facts developed during the hearing amply supported the ALJ and Director's rejection of the realtor's opinion testimony.

Petitioner offered no other testimony that her home was sold for fair market value. In addition, the question of valuation aside, the ALJ and Director could have inferred from petitioner's son's testimony he used his power of attorney to sell her home so she would qualify for Medicaid. The record clearly supports the Director's determination petitioner failed to rebut the presumption. We thus turn to the issue of the penalty.

### III.

The transfer penalty is computed by ascertaining the transferred asset's fair market value and deducting from it the consideration received for the asset.

15

The difference is the asset's "uncompensated value." N.J.A.C. 10:71-4.10(c). The penalty period,

> [i]n accordance with 42 U.S.C. §1396p(c)(1)(E) for asset transfer shall be the number of months equal to the total, cumulative uncompensated value of all assets transferred by the individual, on or after the look-back date, divided by the average monthly cost of nursing home services in the State of New Jersey adjusted annually in accordance with the change in the Consumer Price Index-All Urban Consumers, rounded up to the nearest dollar.
>
> [N.J.A.C. 10:71-4.10(m)(1).]

The fair market value of assets transferred during the look-back period "shall be an estimate of the value of an asset, based on generally available market information, if sold at the prevailing price at the time it was actually transferred. Value shall be based on the criteria for evaluating assets as found in N.J.A.C. 10:71–4.1(d)." N.J.A.C. 10:71-4.10(b)(6). "The equity value of real property is the tax assessed value of the property multiplied by the reciprocal of the assessment ratio as recorded in the most recently issued State Table of Equalized Valuations, less encumbrance, if any." N.J.A.C. 10:71-4.1(d)(1)(iv).

In her final decision, the Director stated, "[p]etitioner's claim that the municipal tax assessment was too high and did not reflect the market value of the property was not supported by competent evidence." Yet, nowhere in the

16

decision does the Director mention the opinion of petitioner's appraiser, the Camden Board's apparent acceptance of the appraisal as appropriate, or the ALJ's acceptance of the appraisal.

> In reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.
>
> [N.J.S.A. 52:14B-10(c).]

The Director apparently overlooked this statutory requirement when she rejected the ALJ's initial decision. Petitioner's appraiser's opinion that the fair market value of petitioner's home at the time of the appraisal was $78,000 is well-supported by the evidence on the record as a whole. Although the appraisal was made approximately one year after petitioner's home was sold, the overwhelming credible evidence supports the fact that the fair market value of petitioner's home, when sold in its deplorable, unimproved condition, was less

than $78,000. The ALJ's acceptance of the appraisal is supported by sufficient credible evidence in the record.

Because of the absence in the final agency decision of any mention of the qualified appraisal accepted by the ALJ, any discussion of the substantial evidence that the appraised value exceeded the home's fair market value when sold, and any mention or apparent compliance with N.J.S.A. 52:14B-10(c), the decision concerning the transfer penalty appears to be arbitrary and unreasonable. Virtua-West Jersey Hosp. Voorhees, 194 N.J. at 422. However, as the oversight may have been unintentional, we remand this matter to the Director to address these issues at a hearing after providing the parties the opportunity to submit supplemental briefs. The matter is remanded only as to the penalty. We affirm the determination petitioner's home was transferred for less than fair market value to establish Medicaid eligibility.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION