┌─────────────────────────────────────────────────────────────────┐
│                                                                   │
│              **NOT FOR PUBLICATION WITHOUT THE**                  │
│              **APPROVAL OF THE APPELLATE DIVISION**               │
│                                                                   │
│  This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the │
│  internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3. │
│                                                                   │
└─────────────────────────────────────────────────────────────────┘

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1766-23

R.G.,[1]

     Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES and OFFICE OF
COMMUNITY CHOICE OPTIONS,

     Respondents-Respondents.

_____

> Argued September 30, 2025 – Decided October 16, 2025
>
> Before Judges Firko and Vinci.
>
> On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.
>
> Harvey M. Fruchter argued the cause for appellant (Fruchter & Associates, LLC, attorneys; Harvey M. Fruchter and Tyler J. Ford, law student, appearing pursuant to Rule 1:21-3(b), on the briefs).

---

[1] We use initials to protect medical, psychiatric, and psychological records, reports, and evaluations. R. 1:38-3(a)(2).

Elizabeth M. Tingley, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Elizabeth M. Tingley, on the brief).

PER CURIAM

Petitioner R.G. appeals from a January 23, 2024 final agency decision of the New Jersey Department of Human Services, Division of Medical Assistance and Health Services (Division), upholding the Office of Community Choice Options's (OCCO) determination that R.G. is ineligible for nursing facility services under Medicaid. We affirm.

On January 15, 2021, OCCO conducted an initial clinical eligibility assessment of R.G. and determined she was eligible for Medicaid and in need of nursing facility level of care. R.G. was admitted to the Autumn Lake Healthcare Nursing Home in Berkeley Heights (Autumn Lake).

On December 15, 2021, R.G.'s managed care organization (MCO) conducted an annual reassessment of her eligibility and found she "completed rehab[ilitation]" and her medical condition "has since improved and no longer needs the same level of care she initially needed." R.G. "was independent with all qualifying ADLs [activities of daily living] and did not display any signs and symptoms of cognitive deficits." On December 16, 2022, the MCO conducted

2

a second annual reassessment and determined R.G. did "not meet criteria for [n]ursing facility level of care."

On April 24, 2023, Autumn Lake created a minimum data set (MDS), which is a federally mandated clinical assessment of a resident's functional capabilities in Medicaid certified nursing homes. The MDS indicated R.G. needed supervision with walking but was independent in all other ADLs.

As a result of the COVID-19 pandemic, OCCO did not perform an annual reassessment in 2021 or 2022. On May 23, 2023, Carolyn Burton, RSN, an OCCO regional staff nurse, reassessed R.G. for eligibility. On February 24, 2023, OCCO notified R.G. that it decided she was "not clinically eligible for [n]ursing [f]acility [l]evel of [c]are . . . in accordance with N.J.A.C. 8:85-2.1."[2]

R.G. contested OCCO's decision, and the matter was transferred to the Office of Administrative Law for a fair hearing. An Administrative Law Judge (ALJ) conducted a three-day hearing. Nurse Burton testified for OCCO. R.G. testified and called as witnesses her primary care doctor, Dr. GianAngelo Graci; her aunt; and two expert witnesses, Dr. Adina N. Alexescu and Dr. David Worth.

---

[2] In November 2024, N.J.A.C. 8:85 was recodified to N.J.A.C. 10:166. See N.J.R. 2242(a) (Nov. 18, 2024).

Nurse Burton conducted a "New Jersey Choice" assessment of R.G., who was then sixty-seven years old, at Autumn Lake. New Jersey Choice is "an assessment tool . . . developed by the New Jersey Department of Human Services." When Nurse Burton arrived, she "observed [R.G.] walking down the hall with her walker." R.G. "directed [Nurse Burton] to her room [where] [R.G.] closed the door, and . . . positioned herself to sit down in a chair."

Still using the New Jersey Choice assessment tool, Nurse Burton "spoke with [R.G.]" and "checked her cognition, [and] her [ADLs]." The ADLs included "eating, bathing, dressing, . . . mobility, transfers, toileting[,] and locomotion." Nurse Burton personally observed R.G. "transfer[] from a standing position to a sitting position . . . using her walker." Further, "[s]he was walking independently with her walker and did[ not] require any assistance."

Nurse Burton met with R.G. for "about an hour" and concluded she "did not have any cognitive deficits." R.G. told Nurse Burton she was able to perform all her ADLs independently and "did not need any assistance with those things." After meeting with R.G., Nurse Burton reviewed her "chart at the facility" including the "nurse's notes, the doctor's notes, the physical therapy[,] . . . all the notes from the social work[er,]" and "any consultant notes." She "conferred with the nursing staff" and "spoke with the social worker" and "the clinical

manager" for "about an hour" and "they all indicated the same [thing], that [R.G.] did not require any assistance."

Nurse Burton also reviewed the MDS, which is a tool that "includes the medical history, the cognition, [ADLs], continence, things like that." The "MDS simply stated that [R.G.] did not require any assistance with ADLs . . . and that she did[ not] have any cognitive deficits." Based on her assessment, including her interview of R.G., review of the records, and meetings with the nursing staff and social worker, Nurse Burton determined R.G. "did not need any assistance with her [ADLs]" and "did not need nursing home care."

Dr. Graci was R.G.'s primary care doctor since August 2022 and saw her "[a]bout [eleven] or [twelve] times." He "believe[d] that [R.G.] is a high[-]risk patient medically and that if she did not have access to medical attention and assistance with custodial care for some of her ADLs[,] . . . she would be very high[-]risk medically." He conducted a "test for ambulation" that indicated R.G. "has a [moderate-to-high] fall risk."

Dr. Graci also testified she "suffers from several medical conditions which increase her fall risk and medical risk in general." These include: pulmonary disease, asthma, sleep apnea requiring a positive pressure device and oxygen at night, high blood pressure, osteoarthritis in her knees, and a meniscal tear in her

left knee that was repaired surgically. He also stated R.G. is diabetic and self-injects herself with insulin five times per day using "an insulin pen" that "is simply like taking [a] pencil . . . and putting it against [her] and pressing the button." She also suffers from depression.

Dr. Graci testified R.G. is dependent on others for "instrumental activities of daily living" including "shopping, housekeeping, accounting, food preparation[,] and transportation" and "has difficulty navigating steps." She requires assistance using the toilet because of her obesity and "mobility deficits from her arthritis." He opined that outside Autumn Lake, R.G. "would be very high-risk for hospitalization and poor health outcomes." On cross-examination, Dr. Graci conceded he was "not familiar with the details of [Medicaid clinical eligibility]" and had "not observed [R.G.] performing" ADLs other than ambulating.

Dr. Graci reviewed an August 10, 2023 report by Dr. Daniel T. Huberman, who treated R.G. for diabetes. Dr. Huberman noted R.G. "has a myriad of medical complications" in "addition to diabetes" and "her ability to properly care for herself is . . . inhibited by cognitive and emotional impairment." "It is therefore medically necessary for her to remain eligible for" Medicaid. Dr. Huberman did not testify.

A-1766-23

Dr. Alexescu testified as an expert in "internal medicine and geriatric patients." She saw R.G. twice in her office and reviewed "her hospital records as well as her cardiology evaluations." During her first visit with R.G., she "noticed that [R.G.] was walking using a walker and . . . that she got short of breath after a relatively short walk in [her] office." She summarized R.G.'s medical conditions based on the records and noted "in [her] office she exhibited" low oxygen saturation levels, which could result in a fall.

Dr. Alexescu opined R.G.'s "medical conditions are chronic" and "[i]n an environment where she might not have adequate administration of medication, supervision with compliance with the medications, [and] supervision . . . with the diet . . . , she would go into exacerbation of the chronic conditions . . . that will end up requiring hospitalizations." She did not believe R.G. "has the ability to maintain her reasonable standard of living out of a nursing home or out of an assisted living facility." On cross-examination, Dr. Alexescu conceded she is not familiar with the qualifying criteria for Medicaid nursing level of care. She did not observe R.G. performing any ADLs other than ambulating.

Dr. Worth testified as an expert in internal medicine and rheumatology. He examined R.G. on one occasion "because of her knee problems." R.G. requires "[s]ophisticated . . . nursing supervision" in a nursing facility because:

> [s]he has a multiplicity of problems. Diabetes, . . . a pulmonary condition, cardiac condition, carbon dioxide retention. If that gets too high that can cause confusion. She needs a device for sleep. She has osteoarthritis with her knees. She can[ not] [navigate] stairs. Can[ not] lift. Gets dizzy if she turns around. [She h]as history of anxiety and depression.

Dr. Worth "looked at" the qualifying criteria for nursing facility level of care but could not "remember all the factors." He did not observe R.G. performing any ADLs.

R.G.'s aunt testified that when R.G. was in high school, "she was in the self-contained classroom with other children" because of her hearing loss. R.G. often "gets very angry" and "very aggressive." She "cannot really walk any great distance . . . without the walker. If she tries[,] she gets dizzy." She has never observed R.G. "fall to the floor" but she has "seen her get dizzy and . . . catch herself." "For the most part[,]" R.G. can dress herself independently.

R.G. testified she did not understand the questions Nurse Burton asked her during the assessment. She testified that she has difficulty climbing stairs and "navigat[ing] the curb" when she gets out of a car. Her weight "affects [her] breathing" and if she walks "a little bit" she needs to "stop and sit . . . to catch [her] breath." R.G. also testified that she needs "help to get up out of bed" and "to walk, once [she] get[s] out of bed" because she gets "very dizzy" and her

8

"knees . . . get stiff on [her]."  The first day she arrived at Autumn Lake, she fell twice, but it had been more than one year since she fell.  She testified that she is able to shower and use the bathroom by herself using her walker and "the bars," but "[s]ometimes" she needs assistance going to the bathroom and getting dressed.

The week before R.G. testified, she picked up a new pair of glasses, by herself, by taking a bus from Autumn Lake.  She took her walker and "the driver help[ed] [her] to get up on the bus and . . . get off of the bus."  R.G. injects herself with insulin five times per day and needs to ask a nurse for help with the insulin "close to five times" per week.  Before she injects the insulin, she "check[s] [her] blood sugar, prick[s] [her] finger, put[s] a chem strip in the machine[,]put[s] the blood on the chem strip[,] and it reads [her] blood sugar."

On November 6, 2023, the ALJ issued his initial decision reversing OOCO's determination that R.G. was not clinically eligible for nursing facility level of care.  The ALJ rejected Nurse Burton's assessment because "R.G. did not fully understand what an assessment was and did not fully understand the questions . . . due to [her] cognitive impairment."  Additionally, Nurse Burton "did not speak to R.G.'s treating physician, Dr. Graci, prior to completing her assessment."

Based on the testimony of Dr. Graci, the ALJ found "[b]oth Dr. Graci and Dr. Huberman . . . conclude that R.G. should remain eligible for nursing facility care due to her on-going medical, emotional, and cognitive issues." The ALJ "conclude[d] that based upon the credible testimony of [Dr. Graci], R.G. is entitled to [nursing facility] services because a preponderance of evidence exists that she met the clinical criteria for Medicaid-[nursing facility] at the time of OCCO's denial."

On January 23, 2024, the Division issued its final agency decision reversing the ALJ's initial decision and upholding OCCO's "determination that [R.G.] does not meet the clinical eligibility criteria" for nursing facility level of care. The Division found:

> The May 23, 2023 assessment by [Nurse Burton] included an in-person interview, review of medical chart records maintained by the facility, [and] prior December 16, 2022 and December [15][,] 2021 assessments conducted by [R.G.'s] MCO, and the [MDS]. . . . Based on the comprehensive review and assessments, [Nurse Burton] found that [R.G.'s] cognitive status was intact, including her decision-making, short-term memory, procedural recall, ability to understand others, make herself understood, and ability to correctly answer questions. [R.G.] was observed walking in the hallway using a rolling walker with a steady gait, and was noted to be alert and oriented to person, place, and time. The assessment found no indication of disordered thinking. [R.G.] explained that she was independent with ADLs and did

10

A-1766-23

not require any assistance, which was confirmed by [R.G.'s] social worker and unit manager.

In addition to the MDS . . . the medical chart records . . . spanning from January 2021 to May 2023, detail [R.G.'s] various medical conditions and consultations. However, these records consistently report a lack of a need for assistance from staff in ADLs, instead documenting "no set up or physical help from staff" in relation to bed mobility, transfers, eating[,] and toilet use."

. . .

Dr. Worth, Dr, Huberman, and Dr. Alexescu do not opine that [R.G.] is cognitively impaired or conclude that [she] is dependent on physical assistance with three or more specific ADLs. Furthermore, the treating records of Dr. Graci do not contain a finding of cognitive impairment or note dependence with ADLs.

The Division noted, "in concluding that [R.G.] met the clinical eligibility standard, the ALJ found that the evidence presented by Dr. Graci was more credible than the evidence presented by OCCO." The Division determined:

In contrast to the ALJ's decision, . . . the totality of the medical records do not support that [R.G.] met the clinical eligibility criteria. The credibility of the evidence presented by OCCO, including the New Jersey Choice Assessment[,] in collaboration with [R.G.'s] social worker and unit supervisor, outweighs the isolated findings presented by Dr. Graci.

While [R.G.'s] medical conditions and needs must not be minimized, unfortunately[,] the comprehensive

medical records do not support a finding that [R.G.] meets the criteria as set forth in N.J.A.C. [10:166-2.1].

On appeal, R.G. argues: (1) the Division's decision was arbitrary and capricious because OCCO's assessment was not "comprehensive" and the decision lacks credible support in the record; (2) the Division's decision is contrary to the plain language of N.J.A.C. 10:166-2.1 and N.J.A.C. 10:166-2.2; and (3) the court need not defer to the Division's interpretation of the administrative code.

Our "review of [the Division's] determination is ordinarily limited." C.L. v. Div. of Med. Assistance & Health Servs., 473 N.J. Super. 591, 597 (App. Div. 2022). "An administrative agency's decision will be upheld 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the [party] challenging the administrative action." E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010) (alteration in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)).

12

"Deference to an agency decision is particularly appropriate where interpretation of the [a]gency's own regulation is in issue." I.L. v. N.J. Dep't of Hum. Servs., Div. of Med. Assistance & Health Servs., 389 N.J. Super. 354, 364 (App. Div. 2006). "Nevertheless, we are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" C.L., 473 N.J. Super. at 598 (quoting R.S., 434 N.J. Super. at 261).

"Medicaid is a federally-created, state-implemented program that provides 'medical assistance to the poor at the expense of the public.'" In re Est. of Brown, 448 N.J. Super. 252, 256 (App. Div. 2017) (quoting Est. of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J. Super. 210, 217 (App. Div. 2004)); see also 42 U.S.C. § 1396-1. In New Jersey, the Medicaid program is administered by the Division pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5. Through its regulations, the Division establishes "policy and procedures for the application process." N.J.A.C. 10:71-2.2(b).

Adults on Medicaid are eligible for nursing facility services if they satisfy certain financial, N.J.A.C.10:166-1.8, and health-related criteria, N.J.A.C. 10:166-2.1. Clinical eligibility is "determined by the professional staff designated by [the OCCO]," "based on a comprehensive needs assessment that

demonstrates that the beneficiary requires, at a minimum, the basic [nursing facility] services described in N.J.A.C. [10:166]-2.2" N.J.A.C. 10:166-2.1(a).

These individuals:

> may have unstable medical, emotional/behavioral[,] and psychosocial conditions that require ongoing nursing assessment, intervention[,] and/or referrals to other disciplines for evaluation and appropriate treatment. Typically, [they] have severely impaired cognitive and related problems with memory deficits and problem solving. These deficits severely compromise personal safety[,] and, therefore, require a structured therapeutic environment. [They] are dependent in several [ADLs]. . . .
>
> [N.J.A.C. 10:166-2.1(a)(1).]

We are satisfied the Division's determination is supported by sufficient credible evidence and was not arbitrary, capricious, or unreasonable. Nurse Burton met with R.G. and concluded she "did not have any cognitive deficits." R.G. reported she was able to perform all her ADLs independently and "did not need any assistance with those things." Nurse Burton personally observed R.G. ambulating and transferring from a standing to a sitting position using her walker without the need for assistance.

Nurse Burton additionally reviewed R.G.'s "chart at the facility" including the "nurse's notes, the doctor's notes, the physical therapy[,] . . . all the notes from the social work[er]" and "any consultant notes." She "conferred with the

14

nursing staff" and "spoke with the social worker" and "the clinical manager," who reported R.G. did not require any assistance with ADLs. Nurse Burton also reviewed the MDS, which further confirmed "[R.G.] did not require any assistance with ADLs . . . and . . . that she did[ not] have any cognitive deficits." To the extent she did not personally observe R.G. performing ADLs, she based her assessment on information obtained from R.G.'s medical records and the individuals who were in the best position to provide accurate information—R.G.'s nurses and social worker.

R.G.'s claim that Nurse Burton's assessment was not "comprehensive" as required by N.J.A.C. 10:166-2.1 because she did not speak to Dr. Graci is incorrect. In support of this contention, R.G. argues Nurse Burton was conducting a "comprehensive assessment," defined as a "process conducted by each member of the interdisciplinary team," which includes "a physician" to create "an interdisciplinary plan of care." N.J.A.C. 10:166-1.2.

However, Nurse Burton was conducting a "comprehensive needs assessment" pursuant to N.J.A.C. 10:166-2.1, not a "comprehensive assessment" as defined in N.J.A.C. 10:166-1.2. There is no requirement that the Division speak with a physician when conducting a "comprehensive needs assessment"

A-1766-23

to determine eligibility for nursing facility services pursuant to N.J.A.C. 10:166-2.1.

Lastly, R.G.'s claim that Nurse Burton "irresponsibly" relied on R.G.'s "self-reporting statements" lacks merit. To the contrary, she confirmed all of R.G.'s statement through her review of the medical records and the MDS, as well as her conferences with the nursing staff and social worker. Nurse Burton's findings were based on substantially more than R.G.'s own statements.

There is no basis for us to disturb the Division's decision. R.G. failed to meet her burden to demonstrate the decision was arbitrary, capricious, or unreasonable. E.S., 412 N.J. Super. at 349. To the extent we have not specifically addressed any of R.G.'s remaining arguments, it is because the Division's decision is supported by sufficient credible evidence on the record as a whole. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1766-23